# EXHIBIT "4"

## AFFIDAVIT OF DR. MARK NEIGHBORS

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LOUIE ALEXANDER,                               :
                                               :
     Plaintiff,                          :
                                               :
-vs-                                           :          Case No. 3:06-cv-498-WKW
                                               :
OPELIKA CITY BOARD OF EDUCATION,               :
                                               :
     Defendant.                          :
                                               :
                                               :

### AFFIDAVIT OF DR. MARK NEIGHBORS

    Before me, the undersigned authority, in and for said county and state, personally appeared Dr. Mark Neighbors, who being known to me and being first duly sworn, deposes and says under oath as follows:

    1.    My name is Dr. Mark Neighbors.  I am a white male over the age of nineteen and I have personal knowledge of the matters set forth herein.

    2.    I have been the Superintendent of the Opelika City Schools since January 1, 2007.  From 2002 to 2007, I was an Assistant Superintendent for administration.  At the time that Louie Alexander was a custodian at Opelika High School, I was an Assistant Superintendent.  During Louie Alexander's employment, J. Philip Raley was the Superintendent of Opelika City Schools.

    3.    Louie Alexander was employed as a custodian at Opelika High School from November 13, 2003 to November 16, 2005.  At all times, Mr. Alexander was a probationary employee with the Board.

4.      During the employment of Louie Alexander, Stan Cox (white male) was the Principal of Opelika City Schools.  Jan Funderburk (white male) and Jason Bryant (black male) were the Assistant Principals during that time.

5.      In August 2005, Mr. Alexander called me to complain that Mr. Bryant asked him to pick up crumbs in an area of the school that was not assigned to Mr. Alexander.  The substance of that phone call is summarized in my correspondence to the EEOC dated November 30, 2005, attached hereto as Exhibit "A".  At no time during that phone call with Mr. Alexander did he complain of the term "boy" being used, nor did he describe any incident where racially derogatory terms were used towards him.  Mr. Alexander did not express to me that he felt like he was being treated differently because of his race at that time.  Rather, Mr. Alexander was simply drawing a line in the sand about what he thought he should have to do on the job.

6.      In late September 2005, I learned of a verbal altercation between another custodian, James Chance (white male) and Mr. Alexander.  Based on that incident and other problems that were apparently occurring at the school, Principal Stan Cox informed me that he would be recommending Mr. Alexander's termination.  I wanted to have as much information as possible regarding any of the incidents and Mr. Alexander's work at the school before considering that recommendation so I instructed Jan Funderburk to interview Mr. Alexander's co-workers.  The information resulting from those interviews is attached hereto as Exhibit "B".

7.     On October 3, 2005, I received a written recommendation for Mr. Alexander's termination from Principal Stan Cox.  That recommendation memorandum is attached as Exhibit "C".

8.     After receiving the written recommendation, I determined I would like to meet with Mr. Alexander personally before making a recommendation to the Superintendent regarding Mr. Alexander's potential termination.   It was being represented to me that nobody could work with Mr. Alexander and I wanted to assess for myself whether that was, in fact, the case.  I initiated the phone call to Mr. Alexander and asked him to come see me.  During the course of the meeting, I asked Mr. Alexander about the various allegations mentioned in Jan Funderburk's written documentation.  He denied the allegations and talked to me about the short comings of the other custodians, both black and white.  In regards to the most recent altercation with Mr. Chance, Mr. Alexander simply stated that Mr. Chance cursed at him.  At no time during that meeting did he express that anyone used racially derogatory terms towards him or did he express that he was being treated differently than the white custodians.  Rather, he was simply complaining that he was asked to do work that should not be his responsibility, that other custodians were sleeping on the job, and in general, that other custodians were not taking care of their areas of the school.  To be clear, this complaint was not about the white custodians, it was about the other custodians in general.  Alexander's main complaint was that he did not feel he should be asked to work in other areas of the school that were not his areas.  At the conclusion of the meeting I determined that my recommendation would be for Mr. Alexander's

3

termination.   My greatest concern at that point was his aggression towards his co-workers.

9.    I recommended Mr. Alexander be terminated to the Superintendent who recommended the termination to the Board.   The Board voted to termination Mr. Alexander's employment effective November 16, 2005.

10.    Although I am not sure of the exact date, I met with the AEA representative from our area, Patsy Jones, about Mr. Alexander prior to the Board meeting at which the Board voted to terminate Mr. Alexander.  During the course of that meeting, Ms. Jones never raised an issue with me concerning racially derogatory terms being used, improper time sheets, or disparate work assignments because of race. Based on my relationship and past work experience with Ms. Jones, I am confident that she would have relayed these alleged concerns to me if they had been brought to her attention by Mr. Alexander.  Ms. Jones simply advocated for Mr. Alexander's job.

11.    Opelika City Schools has a no tolerance policy regarding any form of race harassment or discrimination.  If I had been put on notice of any such allegations, it would have been investigated and dealt with immediately.  The Board's policy on this matter is attached hereto as Exhibit "D".

12.    Because no harassment complaint was brought to my attention, I never spoke to the Superintendent or any Board member regarding alleged race harassment.


Further affiant saith not.

DR. MARK NEIGHBORS

4

# EXHIBIT "A"

**Correspondence from Dr. Mark Neighbors to EEOC dated
November 30, 2005**

J. PHILLIP RALEY
  SUPERINTENDENT
MARK D. NEIGHBORS
  ASST. SUPERINTENDENT
ANNIE A. WYATT
  ASST. SUPERINTENDENT
BARBARA CUTRIGHT
  TREASURER

# OPELIKA CITY SCHOOLS
### P.O. Box 2469        Phone 745-9700
### OPELIKA, ALABAMA 36803-2469

BOARD OF EDUCATION
O.D. ALSOBROOK, III
  CHAIRMAN
ROBERT T. MEADOWS, III
JOE N. PINKARD
PATSY BOYD PARKER
KATY PARRENT LEONARD

November 30, 2005

## FILE COPY

MAILED Certified

DEC 01, 2005

BY _____

Ms. Debra B. Leo
ADR Coordinator
Birmingham District Office
Ridge Park Place
1130 22nd Street, South
Birmingham, AL 35205

Dear Ms. Leo:

In response to the allegations presented by Mr. Louie Alexander in his EEOC charge of discrimination in charge number 130-2006-00-522. I offer the following information for your consideration.

Mr. Alexander's allegation regarding African American employees being asked to perform tasks for white employees is unfounded in that while each person has areas of specific work, all employees are expected to assist in set up and general cleaning for special events. In a large high school, special events occur several times a week, which require janitors to be pulled off their regular schedules to set up and clean up after the events. All employees are asked to assist with these events. Mr. Alexander did not participate as requested for these events. He would do what he felt was his part then leave the area while the other custodians were still working to either set up or clean up. For example, he and two other janitors were asked to put down the lunch tables for an event. He put down 1/3 of the tables then left the area while the other janitors put down the remaining tables. We expect all employees to help each other until all tasks are completed.

Mr. Alexander called me in August to complain about being asked by Mr. Bryant, an African American assistant principal, to sweep up potato chips that were on the carpet. Mr. Bryant asked Mr. Alexander to do this since he was walking by with a broom and dustpan in his hand. Instead of cleaning as asked, Mr. Alexander looked for the janitor who was assigned to that area. Mr. Alexander did not believe that he should be asked to do something that was not in his area. In that telephone conversation I explained to Mr. Alexander that I as well as the superintendent of education pick up trash as we walk into the buildings. Keeping a clean school is everyone's responsibility. Mr. Alexander did not believe that he needed to clean the chips up. Once I realized that I could not get him to understand how we all needed to work together; I advised him that he needed to do what he was asked to do so long as it was reasonable and in the scope of his work. I told him that if he felt he was treated unfairly to follow the grievance procedure in the policy manual. During the entire conversation and during a later conference I had with Mr. Alexander prior to his dismissal, he never made any comment about being called a "boy" or any other derogatory terms. The only time I have been informed of the term "boy" being used was when Mr. Alexander used the term in an attempt to provoke another employee. However, there were no witnesses other than the two employees. Mr. Funderburk and Mr. Wingo have informed me that Mr. Alexander never raised this issue before now.

Alexander v. Opelika City BOE

Discovery
0078



Opelika High School had eleven janitorial employees when Mr. Alexander was still employed. Seven of the eleven were African American. Currently we have six of ten African American employees at Opelika High School. Currently substituting in Mr. Alexander's former position is an African American female, who is the leading candidate for the position. Normally, we will substitute the position with the best candidate so that they have a chance to get a feel for the job while allowing us to see how well he or she performs and relates with our other employees.

Also, we had problems with Mr. Alexander in terms of accurately recording his work times on his time sheets. The employee is responsible for marking arrival and departure times on his individual time sheets. The supervisor collects the time sheets at the end of the week and checks the week's work time and then turns the sheets into the payroll secretary. This is the first that I have heard of Mr. Alexander's complaint regarding Mr. Wingo marking time sheets inaccurately.

Prior to the board's termination proceedings, I met with Ms. Patsy Jones who is the Alabama Education Association Uniserve representative for our school. In that meeting she raised none of these issues. The only issue that we discussed was that Mr. Alexander felt he was asked to do more than his area of responsibility. Ms. Jones raised neither the derogatory terms nor the time sheet issues. In my working experience with Ms. Jones, I am confident that if she had received that type of concern, she would bring it to my attention.

I have enclosed a summary of the issues that Mr. Funderburk, who is the supervising assistant principal of the janitorial staff, has dealt with since Mr. Alexander has been employed. Mr. Wingo's personal log of discussions and conferences was removed from his office and thus unavailable for review. While we had employees see Mr. Alexander going through Mr. Wingo's desk we did not allege that he removed the notebook. Mr. Wingo assisted Mr. Funderburk in compiling the enclosed summary.

In conclusion, Mr. Alexander was dismissed based on his inability to work effectively with others and an because of an increased level of agitation and aggression toward other employees. Mr. Alexander was not terminated due to any other reason. Additionally, Mr. Alexander was dismissed within the requirements set forth in 36-26-101 Code of Alabama. Grounds for dismissal are not required to be given for probationary employees during the actions of the board. Tenured employees have procedural due process rights under State Law. Probationary employees have very limited rights, which were adhered to in this dismissal.

I am available to you for any further questions.

Sincerely,

Mark Neighbors
Assistant Superintendent

MN/lwt

Alexander v. Opelika City BOE

Discovery
0079

# EXHIBIT "B"

**Information resulting from Funderburk's Interviews with Alexander's Co-Worker**



# OPELIKA HIGH SCHOOL
LAFAYETTE PARKWAY          PHONE (334) 745-9715
OPELIKA, ALABAMA 36801-3199

## M E M O R A N D U M:

TO:        Dr. Mark Neighbors, Assistant Superintendent

FROM:      Jan Funderburk, Assistant Principal Opelika High School

SUBJECT:   Documentation on Louie Alexander

DATE:      November 18, 2005

Please find enclosed all the documentation I have concerning Louie
Alexander and his employment at Opelika High School.

If there are any questions or concerns please advise me.

Alexander v. Opelika City BOE

Discovery
0037

I conducted interviews with all of the maintenance staff on Thursday September 29, 2005 and on Friday September 30, 2005 concerning Louie Alexander and his behavior at work. I also talked with Mr. Jason Bryant, assistant principal, about an incident that happened on August 16, 2005. During the interviews the following items came to light.

August 17, 2005
Jan Funderburk ( White male, assistant principal) and Jason Bryant (African-American male, assistant principal, Opelika High School) present.

- On August 16, 2005, Louie pointed out to Mr. Bryant that cracker crums had been left on the floor of mainstreet. Louie stated that Ms. Moore, whose week it was to clean mainstreet, was not doing her job.
- After pointing out the crums to Mr. Bryant Louie walked off without cleaning up the crums eventhough employees know that they are responsible for the entire campus when they see something that needs to be done.

September 29, 2005:
Jan Funderburk and Doris Holland (African-American female) present:

- Doris stated to me that "Louie was crazy" and she was afraid of him.

September 29, 2005:
Jan Funderburk and Etta Torbert (African-American female) present:

- Etta said she witnessed the verbal confrontation between Louie and James Chance on September 28, and that she worried about the night crew.

September 29, 2005:
Jan Funderburk and Willie Giles (African-American male) present:

- Willie stated that Louie was not putting the correct times down on the time sheets when working at the stadium on Saturdays.
- Willie also witnessed the verbal confrontation between Louie and James on September 28.

September 29, 2005:
Jan Funderburk and Ken Mangram (White male) present:

- Ken informed me that Louie was not putting down the correct times on the time sheets when working at the stadium on Saturdays.

September 29, 2005:
Jan Funderburk and Debra Morgan (African-American female) present:
- Debra stated that Louie was not putting down the correct times on the time sheets when working at the stadium on Saturdays.
- She stated that she felt threatened by him.
- Debra stated that she had seen Louie going through the files in the office of the maintenance supervisor and had also seen him coming out of classrooms in the building that were not part of his area of responsibility.

September 29, 2005:
Jan Funderburk and Mae Moore (African-American female) present:
- Ms. Moore stated that Louie did not help put down tables or help take them up so the football team could eat after a practice session.

September 29, 2005:
Jan Funderburk and James Chance (White male) present:
- James stated that he had seen Louie coming out of rooms that were not part of his responsibility.
- Told me that the times Louie put down on time sheets for working at the stadium on Saturdays were not correct.
- Stated that Louie was on his cell phone a good amount of time during his work night when he should be carrying out his responsibilities.
- James stated that he and Louie had a verbal confrontation over putting down tables for the football team to eat. Louie shoved a chair back from the table and told James that he was not his boss.
- James said that Louie told him to call him "boy" and he would take care of him.

September 29, 2005:
Jan Fundeburk and Jim McManus (White male) present:
- Jim stated that Louie would not help put down tables or take them up for the football team to eat after practice.
- Jim told me that Louie had said to him that he would "whip his butt."
- Jim stated that Louie had placed a radio on the table in the maintenance work area and turned up the volume. He became upset when the station stopped playing music and stated to the employees "don't touch his radio."

Alexander v. Opelika City BOE

Discovery
0039

- Jim also stated the time Louie was putting down on the time sheets for working at the stadium on Saturdays was not correct.

September 30, 2005:
Jan Funderburk and Sam Pettis (African-American Male) present:
- Sam stated that he had not personally observed any problems with Louie. He had only heard rumors and what other employees were saying.

September 30, 2005:
Jan Funderburk and Henry Avery (African-American male) present:
- Henry said that he had talked to Louie on several occasions about problems at work.

September 30, 2005:
Jan Funderburk and Joe Wingo (White male, maintenance supervisor at Opelika High School) present:
- Joe provided additional information on Louie. He informed me that on September 21, 2005 he had returned to the campus and observed Louie talking to a former employee at her car. He returned later noting that Louie had been talking to her for some twenty-three minutes at a time that was not break or dinner time.
- Joe informed me that on September 26, 2005 he returned to campus and again observed Louie talking to a former employee in the parking lot. Returning to campus sometime later he noted that some forty minutes had passed and Louie was still talking to her at a time that was not break or dinner time.
- Joe gave me a note left by Debra Morgan of the night crew informing him that Louie left work at 9:25 pm on September 29, 2005. The night crew is to work until 10:00 pm.

Alexander v. Opelika City BOE

Discovery
0040

Conferences, meetings, discussions with Louie Alexander

January 24, 2004

- Joe Wingo, Louie Alexander present
- Joe returned to work at 6:30 pm to check if everything was OK. Joe was informed that Louie and Francis had left campus earlier. Mr. Wingo waited for Louie and Francis to return which he did at 6:55 pm. Mr. Wingo asked Louie why he left campus. Instead of answering the question, he started telling Mr. Wingo what everyone else was doing wrong. He was told that the maintenance supervisor would handle any problems other employees had. Louie was informed of the policies concerning leaving campus and was reminded of the conversation he and Mr. Wingo had at an earlier time about leaving. Louie felt that Mr. Wingo was "picking on him." Joe was only informing him of rules that must be followed.

January 25, 2004

- Joe Wingo; Louie Alexander present
- Mr. Alexander reported to work fifteen minutes late and gave no explanation for the lateness. Mr. Wingo stressed what the work hours were for maintenance.

July 28, 2004

- Jan Funderburk, Joe Wingo, Louie Alexander present
- Informed Louie of one change in job responsibilities with another employee. Louie felt he was being mistreated and job responsibilities and attitude was discussed.
- I asked Louie to take on the change in responsibility for a week and if he still felt there was a problem to came back and talk with me. Louie did not return in a week to discuss the change.

May 2, 2005

Alexander v. Opelika City BOE
Discovery
0041

- Joe Wingo, Louie Alexander present
- Louie left work at 5:45 pm and gave contradictory stories as to why he left early.  Work hours were discussed with him.

August 12, 2005

- Jan Funderburk, Joe Wingo, Louie Alexander, and other maintenance personnel present.
- Gave out job descriptions and responsibilities and discussed importance of working together, signing in and out, breaks, leaving campus, and doing job the best they could.  Gave time for employees to ask questions and make comments.

August 17, 2005

- Jan Funderburk, Joe Wingo, Louie Alexander present
- Discussed with Louie cleaning up any trash he sees even if it is not in his area of responsibility.  Louie did not agree with this and wanted to blame the other employee for the trash being there.
- Discussed overall responsibilities and attitude toward work

August 17, 2005

- Jan Funderburk, Louie Alexander present
- Louie returned to further discuss the previous incident and continued to see no problem in what he did and to continue to blame other employee for the chips being left in Mainstreet
- Discussed overall responsibilities and attitude toward work

September 1, 2005

- Joe Wingo, Louie Alexander, James Chance
- Verbal confrontation between Louie and James about parking lot cleanup.  Joe came to school after phone call to his home and sat down with Louie and James to discuss the problem. Both employees told to go home to cool off.  James left but Louie did not.

September 20, 2005

- Joe Wingo, Louie Alexander present
- Louie did not sign out when leaving work on September 19, 2005. Joe reminded Louie of the policy of signing in and out each day.

Alexander v. Opelika City BOE

Discovery
0043

In September of 2005, I had several maintenance employees give me information concerning my office in the maintenance area and Louie Alexander.

Joe Wingo and Debra Morgan (African-American female) present:
- Debra informed me that she observed Louie looking through my desk drawers. Her attention was drawn to my office by the sound of file and desk drawers being opened and closed.

Joe Wingo and Doris Holland (African-American female) present:
- Doris told me she was walking past my office and witnessed Louie going through documents on my desk.

Joe Wingo and James Chance (White male) present:
- James said he saw Louie going through documents in my office and witnessed him leaving my office with papers.

Because of these events we had my office re-keyed for security purposes so no one could go through documents and employee records.

In late September of 2005 I began looking for documentation that I kept on employees in my office and was not able to locate the papers in the file cabinet where they were stored.

Joe Wingo
Maintenance Supervisor

# EXHIBIT "C"

**Written Recommendation from Principal Stan Cox for termination of Alexander**



# OPELIKA HIGH SCHOOL
LAFAYETTE PARKWAY          PHONE (334) 745-9715
OPELIKA, ALABAMA 36801-3199

October 3, 2005

**TO:** Dr. Phil Raley
Superintendent

**FROM:** Stan Cox
Principal

**RE:** Louie Alexander

After a thorough investigation and multiple conference with Louie Alexander, a 10-month custodian at Opelika High School, it has been determined that Mr. Alexander has, on several occasions,

- Not completed tasks that have been assigned to him,
- Is confrontational with other maintenance staff,
- Taken unscheduled, lengthy breaks that interfere with the completion of tasks, and
- Entered inaccurate times on his payroll time sheets.

It is my recommendation that the contract for Louie Alexander, 10-month OHS custodian, be terminated immediately.

Should you require additional information or have questions please do not hesitate to contact me.

Alexander v. Opelika City BOE

Discovery
0045

The first incident involving Louie Alexander during the 2005-2006 school year occurred on 8/16/05. Louie pointed out to Mr. Bryant, assistant principal, that cracker crums had been left on the floor in mainstreet. After showing Mr. Bryant the crums Louie walked off without cleaning them up. A meeting was held with Louie on 8/17/05 to discuss why he did not clean up the curms on mainstreet since his responsibility to clean the building and grounds applies to the entire campus. Louie stated that it was not his area and he blamed other employees for leaving the trash. He was informed that the campus is everyone's area and he should have cleaned it up. Louie talked to me later in the day and informed me that he felt that he should not have to clean up items outside his area.

As other problems were made known to me by the maintenance supervisor, I decided the following action should be taken.

I conducted interviews with all of the maintenance staff on 9/29/05 and 9/30/05 concerning Louie Alexander and issues concerning his behavior at work. During these interviews the following items came to light.

- On 9/21/09 Louie talked with a former employee for some 23 minutes at a time that was not break or dinner time.
- On 9/26/05 Louie talked with a former employee for some 40 minutes at a time that was not break or dinner time.
- On 9/28/05 Louie had a verbal confrontation with a fellow employee who was informing him and other night shift employees of having to set tables for the football team to eat. Louie did not set up any tables according to the other night crew employee.
- One day employee stated that "Louie was crazy" and she was afraid of him.
- Another day employee who witnessed the verbal confrontation on 9/28/05 said she worried about the night crew.
- Several employees both day and night stated that Louie often did not put down the correct times on his time sheets during the week and on Saturday clean up at the stadium.
- A night employee stated that she had seen Louie going through the files in the office of the maintenance supervisor and also had seen him coming out of rooms in the building that were not part of his area of responsibility. She stated that she felt threatened by him.
- Another night employee stated that Louie had stated to him that he would "whip his butt."

Alexander v. Opelika City BOE

Discovery
0046

- Night crew staff also stated that Louie placed a radio on the table in the maintenance area and turned up the volume. He became upset when the station stopped playing music and stated to the employees "don't touch his radio.
- A day employee stated that he had to calm Louie down when he confronted another female day employee over smoothing that was said.
- One night crew employee stated that Louie spends a lot of time on his cell phone when he should be carrying out his maintenance responsibilities.

Maintenance responsibilities have been made clear to Louie by Joe Wingo, maintenance supervisor, Jan Funderburk, assistant principal, and Stan Cox, principal. Louie continues to have problems understanding these responsibilities.

Alexander v. Opelika City BOE

Discovery
0047