IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LOUIE ALEXANDER,                          :
                                          :
         Plaintiff,                       :
                                          :
-vs-                                      :        Case No. 3:06-cv-498-WKW
                                          :
OPELIKA CITY BOARD OF EDUCATION,          :
                                          :
         Defendant.                       :
                                          :
                                          :

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT ON BEHALF OF DEFENDANT**

COMES NOW the Defendant Opelika City School Board in the above-styled cause and

submits the following memorandum brief and evidentiary materials in support of its motion for

summary judgment.

**I.
SUMMARY OF PLAINTIFF'S ALLEGATIONS AND THE
DEFENDANT'S AFFIRMATIVE DEFENSES**

This is a hostile environment case based on race discrimination.  Plaintiff Louie Alexander

(hereinafter "Alexander") brought this action against the Opelika City School Board (hereinafter "the

Board"), alleging causes of action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§2000(e) *et.seq.*, as amended by the Civil Rights Act of 1991, and 42 U.S.C. §1981, and the Fair

Labor Standards Act ("FLSA").  Alexander also asserted a state law cause of action for negligent

supervision.  Alexander's claims were based on factual allegations that he was subjected to a

racially hostile work environment and was terminated in retaliation for complaining about that

environment.

The Board filed an answer asserting various affirmative defenses and, following discovery,

this motion is now right for consideration.  At the outset it should be made clear that after Alexander

gave his deposition, Plaintiff's counsel represented to undersigned counsel that all causes of action initially brought would be dismissed and not pursued, with the exception of the hostile environment claim.[1]  Therefore, Count I-Race Discrimination, Count III-Title VII Retaliation, Count IV-Violations of FLSA and Count V-Negligent Supervision are due to be dismissed.  (See Exhibit "1" Email exchange between counsel for the parties confirming that Count I, III, IV and V in the above-styled cause will be pursued).

## II.
### SUMMARY OF UNDISPUTED FACTS[2]

**A.    THE PARTIES**

      **1.    PLAINTIFF**

Alexander is a black male.  (See Exhibit "2" Deposition of Louie Alexander p. 53 at lines 6-12).  Alexander was hired as a ten (10) month, eight (8) hour per day custodian at Opelika High School, effective November 13, 2003.  (See Exhibit "3" November 13, 2003 Letter to Louie Alexander regarding employment with Opelika City Schools from then Assistant Superintendent Mark Neighbors).  At all times, Alexander was a probationary employee with the Board.  (See Exhibit "4" Affidavit of Superintendent Dr. Mark Neighbors at ¶3).  Alexander was terminated from his custodial position effective November 16, 2005.  (Neighbors Aff. at ¶ 3; see Exhibit "5" October 26, 2005 Termination Letter to Alexander from then Superintendent J. Philip Raley).

---

[1]  Plaintiff's counsel, Jeffrey W. Bennitt, was not Alexander's initial lawyer and therefore did not file the  Complaint in this cause.

[2]  For purposes of clarity this statement of material and undisputed facts includes factual allegations of Alexander, which may not be relevant or actual facts.  Rather, this is a statement of "facts" for purposes of summary judgment. See *Cox v. Administrator, U.S. Steel and Carnagie Pension Fund*, 17 F.3d. 1386,1400 (11th Cir. 1994).  This statement may also contain statements of the absence of critical needed facts, for purposes of clarifying the issues.

### 2. DEFENDANT

The Board is a legal entity charged with "the general administration and supervision of the public schools" for Opelika City pursuant to state statute. (See Ala. Code §16-8-8 (1975)). Dr. Mark Neighbors has been the Superintendent of the Board since January 1, 2007. (Neighbors Aff. at ¶ 2). Prior thereto, Dr. Neighbors was the Assistant Superintendent. (Neighbors Aff. at ¶ 2). During Alexander's employment, J. Philip Raley was the Superintendent of Opelika City Schools. (Id).

During Alexander's employment, Stan Cox was the Principal of Opelika High School. (See Exhibit "6", Affidavit of Stan Cox ¶ 2). Jan Funderburk and Jason Bryant were Assistant Principals of Opelika High School. (Neighbors Aff. at ¶ 4; see also Exhibit "7", Affidavit of Jan Funderburk at ¶ 2). Mr. Cox and Mr. Funderburk are white males. Mr. Bryant is a black male. (Neighbors Aff. at ¶ 4). Joe Wingo, a white male, was the maintenance supervisor at Opelika High School. (Exhibit "8", Affidavit of Joe Wingo at ¶2).

### B. ALEXANDER'S CLAIMS

In his Complaint, Alexander makes various allegations against the Board in regards to the way he was treated, his work assignments or other problems. As stated above, he is dropping all claims except his claim for a racially hostile work environment in violation of Title VII. However, there will be brief facts regarding Alexander's employment and issues that arose during his employment in order to place the hostile environment claim in proper context. Facts regarding his employment, termination, and hostile environment claims are as follows:

### 1. ALEXANDER'S EMPLOYMENT AND TERMINATION

Alexander was employed as a probationary custodian at Opelika High School from November 13, 2003 to November 16, 2005. (Neighbors Aff. at ¶3). The Maintenance Supervisor of Opelika High School, Joe Wingo, first interviewed Alexander for the position in question and sent

Alexander to complete an application. (Alexander Depo. p. 49 at lines 18-24). During the course of Alexander's employment, he did not complete work tasks, took long breaks, was confrontational with employees and had other problems and issues. (Neighbors Aff. at ¶¶5,6; see Exhibit "B" of Neighbors Aff.; see also Cox Aff. at ¶ 3 and Funderburk Aff. at ¶¶ 3-4).

In August 2005, Alexander called Dr. Neighbors (the Assistant Superintendent at the time), and complained that one of the Assistant Principals, Jason Bryant (a black male) had unfairly asked Alexander to clean up crumbs that were on the floor at the school. (Neighbors Aff. at ¶5)[3]. Alexander was upset about this request and felt that it was not his responsibility to clean up the crumbs. (Neighbors Aff. at ¶5 and see Exhibit "A" of Neighbors Aff.). Dr. Neighbors tried to talk to Alexander about the issue but it became obvious that Alexander was not going to understand. (Exhibit "A" of Neighbors Aff.). Therefore, Neighbors simply stated that keeping the school clean was everybody's responsibility. (Exhibit "A" of Neighbors Aff.). Shortly thereafter, in late September 2005, there was a verbal altercation between another custodian and Alexander. (Neighbors Aff. at ¶6). As a result of that altercation and other problems Alexander was having, Principal Cox told Dr. Neighbors that he would be recommending Alexander's termination. (Neighbors Aff. at ¶6). Dr. Neighbors wanted as much information as possible so that he could act appropriately when receiving the recommendation for termination and asked Assistant Principal Jan Funderburk to interview Alexander's co-workers. (Neighbors Aff. at ¶6).

Funderburk was the administrator who oversaw the maintenance staff. (Funderburk Aff. at ¶ 2). Funderburk's interviews revealed the following: Alexander had refused to pick up crumbs in the area of the building where he was not assigned; co-workers found him confrontational; co-

---

[3] Alexander admits that there was an incident regarding paper in the hallway that Mr. Bryant wanted him to pick up, but says that he believes the paper was being intentionally left there for him. (Alexander Depo. p. 141 at lines 2-18). Alexander could not explain why he made this assumption but said it had happened before. (Alexander Depo. p. 141 at line 19 to p. 142 at line 9). Alexander did not know who was leaving the trash and did not see anyone leaving the trash. (Id.)

workers believed he was misreporting his time at work; co-workers felt threatened by him; co-workers witnessed him going through the Maintenance Supervisor's file; co-workers reported that Alexander had not helped with tables before and after football practice sessions; and other problems with Alexander's work ethic and attitude.  (Exhibit "B" of Neighbors Aff., Funderburk's interview notes; Funderburk Aff. at ¶ 5).  Principal Cox then issued a written recommendation for Alexander's termination on October 3, 2005.  (Neighbors Aff. at ¶7; Cox Aff. at ¶3).

After receiving the written recommendation, Dr. Neighbors determined that he would like to talk to Alexander personally before making his final recommendation to the Superintendent. (Neighbors Aff. at ¶8).  Dr. Neighbors called Alexander and asked for the meeting.  (Id.)  Dr. Neighbors discussed the various allegations with Alexander, but he denied the allegations and talked about the shortcomings of the other custodians, both black and white.  (Id.)  Alexander stated that Mr. Chance had cursed him during their verbal altercation.  (Id.)  Alexander complained about work that should not be his responsibility, accused other custodians of sleeping on the job and accused other custodians, in general, of not taking care of their areas of the school properly. (Id.)

At the conclusion of the meeting, Dr. Neighbors determined that it would be his recommendation to the Superintendent and the Board that Alexander be terminated because of his concern regarding Alexander's aggression towards his co-workers.  (Id.)

Prior to the matter being considered by the Board, the AEA representative for the Opelika area, Patsy Jones, met with Dr. Neighbors.  Ms. Jones advocated for Alexander's job, but never mentioned any allegation of race harassment or discrimination.  (Neighbors Aff. at ¶10).  Based on the Superintendent's recommendation, the Board voted to terminate Alexander.  (Neighbors Aff. at ¶9).

2.    **ALLEGED RACIAL WORDS**

Alexander's hostile work environment claim is based on the alleged statements or conduct of three individuals - - two co-workers and Alexander's supervisor:

a.    **Jim McManus (Co-worker)**

Alexander said that on one occasion when he asked McManus for a key, McManus said "get your own key boy." (Alexander Depo. p. 93 at line 24 to p. 94 at line 3).[4]  Then Alexander claimed that McManus had actually said "boy" on more than one occasion.  When asked to explain, Alexander stated: "He have called me this boy on occasionally.  He have did it - - he have completely on occasion called me that racial word." (Alexander Depo. p. 95 at lines 1-10). Alexander then testified as follows:

> Q:    Okay.  Do you have a specific - - and I have down that it was about 5 times - - do you have a specific memory where you could tell us about those 5 occasions?
>
> A:    Um, yes.  I was asked to go into the band room and strip Jim's floors, strip and wax Jim's floors.  And he just stand up watching me laughing at me doing all the work.  And he said it then.
>
> Q:    What did he say?
>
> A:    Started laughing.  I just looked at him.  Boy.  But that's exactly the way he said it.
>
> Q:    So, you were made to strip his floor, and he was allowed to stand there and laugh at you while you stripped it?
>
> A:    Yes, ma'am.
>
> Q:    And then he just said "boy"?
>
> A:    Yes, ma'am.

---

[4]  There is no allegation in Alexander's EEOC Charge regarding McManus saying "boy".

(Alexander Depo. p. 96 at lines 3-22).  The next time Alexander said that McManus called him "boy", Alexander explains that McManus just said the word "boy" for no apparent reason. (Alexander Depo. p. 97 at lines 11-19).  Alexander said that he could not recall other specific occasions where McManus used the word "boy" other than the three he described.  (Alexander Depo. p. 98 at lines 7-14).[5]

### b.    James Chance (Co-worker)

According to Alexander, James Chance also called him a "boy" on one occasion. (Alexander Depo. p. 98 at line 15 to p. 99 at line 12).[6]

Alexander does not know whether McManus or Chance refer to white people as "boys." (Alexander Depo. p. 98 at lines 4-6; p. 99 at lines 13-18).[7]  When asked if there was anything else that his co-worker said to him that he felt was racist, Alexander stated: "I think that's pretty much it."  (Alexander Depo. p. 100 at lines 10 to 19).

### c.    Joe Wingo (Supervisor)

Alexander stated that Joe Wingo once asked him "when your boy get mad with you, do he call you boy?" (Alexander Depo. p. 101 at lines 1-3).

Alexander also said there were then several occasions where Mr. Wingo said racial words or racial things, but when asked for specifics, he only said the following regarding talking to Mr. Wingo about a co-worker:  "He didn't really want to hear what I had to say [about the incident] and walked off from me.  And he said - - I think he said, I'm not 100% sure, but I think he said something racist, too."  (Alexander Depo. p. 104 at lines 2-22).  Alexander was then asked: "Is

---

[5] Alexander makes no claim regarding McManus in the EEOC charge.

[6] Alexander admits that he said to Chance in front of others "why don't you just call me boy." (Alexander Depo. p. 144 at lines 8-15).

[7] Alexander says that no black employees ever called him "boy" nor have the other white custodian, Ken, called him "boy."   (Alexander Depo. p. 99 at lines 19-24).

there anything else that [Wingo] ever said to you that you thought or considered to be racially derogatory?" (Alexander Depo. p. 105 at line 25 to p. 106 at line 2). Alexander said: "I can't remember right now." (Alexander Depo. p. 106 at line 3). Then Alexander took a break and again said that there were a lot of occasions where racist things were said to him by Mr. Wingo. (Alexander Depo. p. 107 at lines 4-7). However, Alexander struggled to relay the alleged specific incidents but eventually testified as follows:

> Q:    And what did Mr. Wingo say to you?
>
> A:    At first, he didn't say nothing. He was just real upset. And then that's what he called me a boy, again.
>
> Q:    And what did he say to you? What was the sentence that he said to you?
>
> A:    I think - - actually, I know exactly what it was. He told me to go in front of the building and pick up some paper. I looked at him. I said okay. He said boy. I just walked off from him.

(Alexander Depo. p. 111 at lines 12-18).[8]

Later in the deposition, Alexander said Wingo called him "boy" during a discussion about a time sheet. (Alexander Depo. p. 133 at lines 7-15). Alexander also claimed that on one occasion Mr. Wingo was talking about a person tying a noose around someone's neck, looked at Alexander and started laughing. (Alexander Depo. p. 112 at line 14 to p. 113 at line 3). Alexander said there was no discussion of hanging black people or words to that effect. (Alexander Depo. p. 113 at lines 4-7).[9]

There were no other specific occasions that Alexander could relay regarding alleged racist comments by Mr. Wingo. (Alexander Depo. p. 113 at lines 8-11). After providing him an

---

[8]  For the record, Wingo denies ever using the term "boy" (Wingo Aff. at ¶ 9).

[9]  For the record, Wingo denies this occurred. (Wingo Aff. at ¶ 9).

opportunity to provide any further information regarding racist things that were said to him, Alexander gave the following testimony:

> Q:    Anybody in the school make racist comments to you or that you were around at work that you haven't told us about?
>
> A:    No, ma'am.
>
> Q:    So, we have covered the racial things that would have been said to you?
>
> A.    Yes, ma'am.

(Alexander Depo. p.116 at lines 6-8; see also p. 114 at line 25 to p. 116 at line 5).

### 3.    OTHER WORK ISSUES

### (a) Extra Work

First, Alexander claims that there were times when the custodians were supposed to be doing team work and "Joe had the blacks doing the work, and the white didn't do nothing." (Alexander Depo. p. 54 at line 18 to p. 55 at line 13). Alexander states that "I would bet my life on it" when asked if other black custodians would support the allegation that white people were not made to work. (Alexander Depo. p. 55 at line 23 to p. 56 at line 4). However, the other custodians actually complained about Alexander and in no way supported his allegations. (Exhibit "B" of Neighbors Aff.; Wingo Aff. at ¶ 8; Funderburk Aff. at ¶ 7). When asked for more specifics as to what Alexander referred, he testified as follows:

> A.    That is just how the supervisor, Joe Wingo, did it. He - - he did not have them doing any kind of work. He just get me or the blacks to do it.
>
> * * *
>
> A:    Ma'am, he would take work from - - you know, I told you everybody had an assignment.
>
> * * *
>
> A:    What you call it, a work schedule. Job duties. He would go in and take all the work from the whites and give it to me or the blacks. He didn't - - he didn't want the whites to do nothing. He made all the blacks do all the work. All of them.
>
> * * *

9

Q:      Once you were given that, did your work assignments ever change in regards to what was written on your sheets?

A:      Yes.

Q:      So, how often would that sheet change?  Like when would you be reissued a sheet?

A:      Right after - - right after - - right after - - my - - I started there in 2003.  2004, after we came back from Christmas - - no, the summer break, I was issued a new sheet.

Q:      Okay.

A:      And Mr. Wingo had given me all of Jim and James' assignments.  Just about all of it.  He gave me the bathrooms, because Jim had complained that he didn't like cleaning the bathroom.  He took it off of Jim's sheet and gave it to me.  He gave me some of James Chance's rooms.

(Alexander Depo. p. 58 at line 4 to p. 61 at line 12).

Alexander's reference to the floors (above) regards an allegation that he was made to scrub the floors in the science building because Mr. Chance did not want to do it any longer.  (Alexander Depo. p. 65 at line 23 to p. 66 at line 17).  Alexander also claimed that he was forced to wax the floors for the white employees.  (Alexander Depo. p. 63 at line 21 to p. 64 at line 19).  When asked what the white employees were doing while he was waxing the floors, Alexander said "nothing, because they didn't do nothing."  (Alexander Depo. p. 69 at lines 1-5).  Alexander also said that white employees would show up to clean up on the weekend and simply not work while he was doing everything he was supposed to be doing.  (Alexander Depo. p. 65 at line 23 to p. 66 at line 17).  Alexander said that on Saturday mornings the black employees would do the cleaning and the white employees would not help.  (Alexander Depo. p. 90 at lines 1-8).  Alexander also said that there was an incident where he had to weed eat at the stadium for a white employee.  (Alexander Depo. p. 75 at lines 12-17).

On the contrary, according to Mr. Funderburk, Alexander was not pulling his weight with team tasks and the other custodians reported these problems during his interviews.  (Funderburk

10

Aff. at ¶¶ 4, 7)[10].  There was never a report from the other custodians that there was a racial harassment or discrimination problem.  (Neighbors Aff. at ¶¶ 10, 11; Cox Aff. at ¶4; Funderburk Aff. at ¶ 7).  Funderburk learned that Alexander was confrontational at work and meetings and found out there were issues with Alexander completing assigned tasks.  (Funderburk Aff. at ¶¶3, 4; Exhibit "A" of Funderburk Aff.).  Moreover, according to Wingo, any assignment given to Alexander was balanced by work given to other custodians.  (Wingo Aff. at ¶¶ 4,5, 6, 7).  Wingo says all floor waxing jobs and setting up for events were group projects, and that all work assignments were adjusted to compensate for any changes made in a work load.  (Id.)

### (b) Time Sheets

Alexander says there were entire days when he worked and his supervisor took the entire day off the time sheet, but Alexander signed it anyway.  (Alexander Depo. p. 170 at line 20 to p. 171 at line 25).  Alexander claims that the supervisor, Mr. Wingo, was adding time to the white employees' time sheets.  (Alexander Depo. p. 173 at lines 21-23).  However, Alexander based this allegation on what he said was a request for overtime, but does not know if the white employees actually worked the overtime requested.  (Alexander Depo. p. 177 at lines 16-19).  Alexander could not point to any particular occasion where he could say his time worked was changed, and, again, admitted he signed all his time sheets.  (Alexander Depo. p. 132 at line 4 to p. 134 at line 25).

### (c) Reporting Harassment

For the record, Defendant denies Alexander ever reported racial harassment or discrimination according to the administrators involved.  (Funderburk Aff. at ¶6; Neighbors Aff. at ¶¶5, 8; Cox Aff. at ¶ 4).   The Board policies are in place for reporting harassment and making a grievance.  (Neighbors Aff. at ¶ 11; see Exh. "D" to Neighbors Aff.).  Alexander filed no such grievance.

---

[10] Alexander denied the allegations that his co-workers made that he did not do his assigned job. (Alexander Depo. p. 66 at lines 18-25).

However, Alexander claims he reported the problems as race issues.  Alexander claims that he talked to Jan Funderburk about the work assignment change when he was assigned the boys' bathroom and alleges that during that conversation he told Mr. Funderburk that racial words like "boy" were being used towards him.  (Alexander Depo. p. 135 at line 18 to p. 136 at line 20).  For the record, Funderburk denies this ever occurred, explaining:

> 6.  At no time during the problems with Mr. Alexander did he complain that he was being treated differently because of his race. At no time during the problems did Mr. Alexander relate to me that anyone referred to him as "boy."  In fact, because Mr. Alexander's problems were not specific to any particular custodian, I was completely unaware that race had anything to do with what was happening.
>
> 7.  I received information from both the black and white custodians regarding Mr. Alexander.  At no time did any one indicate to me that there was a racial harassment situation or state that they were being treated differently because of their race.

(Funderburk Aff. at ¶¶ 6-7).  Because no such complaint was received, Funderburk never told the principal or Dr. Neighbors that there was a race problem.  (Funderburk Aff. at ¶ 8).

According to Alexander, Mr. Funderburk said he would talk to Mr. Wingo.  (Alexander Depo. p. 136 at lines 21-23).  Alexander says this conversation occurred in the summer of 2004. (Alexander Depo. p. 138 at line 23 to p. 139 at line 12).  Alexander also admits that he complained to Mr. Funderburk about Ms. Moore (black female) not doing her job.  (Alexander Depo. p. 139 at lines 13-19).  He made the complaint because he believed he was doing something that should have been Ms. Moore's job.  (Alexander Depo. p. 139 at line 20 to p. 140 at line 2).

Alexander says he talked to Dr. Neighbors on two occasions.  (Alexander Depo. p. 160 at lines 19-23).  Alexander claims that when he was on the phone with Dr. Neighbors and in a meeting, he told Dr. Neighbors about use of the term "boy" and abut doing McManus' and Chance's work.  (Alexander Depo. p. 161 at line 6 to p. 162 at line 6; p. 163 at line 17 to p. 164 at line 12). Alexander is confident that he used the term "race" when making his complaint on the phone with

12

Dr. Neighbors. (Alexander Depo. p. 163 at lines 13-16). Again, Dr. Neighbors denies any such report. (Neighbors Aff. at ¶¶8, 10, 11). Although he now claims that he was making a race complaint, Alexander admits he was also complaining to Dr. Neighbors about Ms. Moore (black female). (Alexander Depo. p. 162 at line 17 to p. 163 at line 9).

Alexander says that on one occasion he called Stan Cox at school and complained that he was doing the white employees' job and being called "boy." (Alexander Depo. p. 164 at line 18 to p. 165 at line 10). Cox denies this complaint. (Cox Aff. at ¶¶ 4, 5). Because Cox never received any such complaint, he never shared any information of race harassment or discrimination with Dr. Neighbors, the then Superintendent or any Board member. (Cox Aff. at ¶ 6).

No other custodial employee has made claims of race discrimination or harassment. (Wingo Aff. at ¶ 9).

Alexander never claims to have reported the alleged "noose" comment.

####    4.    Other Facts

Alexander says that all the people that have knowledge regarding this incident that are white will be untruthful about what happened. (Alexander Depo. p. 167 at lines 9-13). However, Alexander also believes that Patsy Jones (the AEA representative) who is a black female will not be truthful. (Alexander Depo. p. 167 at line 20 to p. 168 at line 12; p. 184 at line 23 to p. 185 at line 16).

Alexander is not aware of what Dr. Neighbors reported to the Superintendent regarding the recommendation for termination and does not know what Dr. Neighbors reported to the Board. (Alexander Depo. p. 186 at line 20 to p. 187 at line 2). Alexander does not know who made the initial recommendation for his termination. (Alexander Depo. p. 179 at lines 8-12).

Alexander does not know who made the decision to terminate him. (Alexander Depo. p. 179 at lines 3-7).

Alexander does not make any indication that he made alleged race complaints to Bryant, a black male Assistant Principal. Alexander states that another Assistant Principal, Ms. Ford, was also there and that he never made any complaints to her. (Alexander Depo. p. 195 at lines 7-23). Ms. Ford is a black female. (Id.)

### C.    ALEXANDER'S EEOC CHARGE

Following his termination, Alexander filed an EEOC charge on or about November 14, 2005. (See Exhibit "9" EEOC Charge of Discrimination). In the EEOC charge, Alexander complained that his supervisor referred to him as "boy" and that a white employee, James Chance, referred to he and other black employees as "boy." (See Exhibit 9). Alexander also complained that he was constantly required to do the work of the white employees and was marked absent on days he was present and working. (See Exhibit 9). Alexander then received a Right to Sue Letter and this lawsuit was timely filed on June 2, 2006.

### III.
### ARGUMENT AND CONCLUSIONS OF LAW

### A.    STANDARDS GOVERNING SUMMARY JUDGMENT

The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact. *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)); Fed.R.Civ.P. Rule 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* supra, 477 U.S. at 323. The moving party's burden may be met either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the non-moving party has failed to make a showing

"sufficient to establish the existence of an element essential to that party's case, and on which [he] will bear the burden of proof at trial." *Celotex*, <u>supra</u>, 477 U.S. at 322; <u>see</u> <u>also</u> *Real Estate Financing v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir. 1992) ("One way to seek an award of summary judgment is for the moving party to demonstrate that an essential element of the non-movant's case is lacking.").

After the moving party has met its burden under Rule 56(e), the non-moving party must go beyond the pleadings and designate specific facts from affidavits, answers to interrogatories and/or depositions showing that there is a genuine issue for trial. *Celotex*, <u>supra</u>, 477 U.S. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d. 538 (1986).

The Eleventh Circuit Court of Appeals has held that where the movant meets the initial burden of showing either that there are no genuine issues of material fact or the absence of evidence to support the non-moving party's case, the burden then shifts to the non-movant to show the existence of a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). The court in *Fitzpatrick* held for issues on which the non-movant would bear the burden of proof at trial as follows:

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex*, 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a

directed verdict motion at trial based on the alleged evidentiary deficiency. (citation omitted).

*Fitzpatrick*, supra,  2 F.3d at 1116.

**B.    RETALIATION, DISCRIMINATION, FLSA AND NEGLIGENT SUPERVISION ARE DUE TO BE DISMISSED**

As previously stated, Plaintiff's counsel has confirmed that Count I-Race Discrimination, Count III-Retaliation, Count IV-Violations of FLSA and Count V-Negligent Supervision will not be pursued.  (See Exhibit "1").  Therefore, Counts I, III, IV and V of Plaintiff's lawsuit are due to be dismissed.[11]

**C.    MERITS OF THE HOSTILE WORK ENVIRONMENT CLAIM**

Even though Alexander chose to pursue his hostile work environment claim following the close of his deposition, that claim is also due to be dismissed as a matter of law.  To establish a *prima facie* case of hostile work environment based on race, Alexander would have to show that:

(1)    [he] belongs to a protective group,
(2)    [he] has been subjected to unwelcome harassment,
(3)    the harassment was based on a protected characteristic of the employee,
(4)     the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create such a discriminatory abusive working environment, and
(5)     the employer was responsible for such environment under a theory either vicarious or direct liability.

*Mosley v. Meristar Management Co.,* 137 Fed. Appx. 248, 252 (11th Cir. 2005),(citing *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275)(11th Cir. 2002)).

The only element Alexander can credibly establish in developing a *prima facie* case is that he belongs to a protected group.  Alexander cannot prove any of the other elements of a hostile environment claim.

---

[11]  If for any reason it is determined that these issues should be addressed, the Defendant reserves the right to do the same, citing to necessary evidence or law in its reply brief.

Alexander bases his hostile environment claim on the following allegations:

(1) his supervisor, Mr. Wingo, referred to him as "boy" on approximately three different occasions and said something about a noose then laughed while looking at Plaintiff. (Alexander Depo. p. 101 at lines 1-3; p. 104 at lines 2-22; p. 105 at line 25 to p. 107 at line 7; p. 111 at lines 12-18; p. 112 at line 14 to p. 113 at line 7; p. 114 at line 25 to p. 116 at line 8)

(2) a white co-worker (James Chance) used the term "boy" in reference to Alexander on one occasion (Alexander Depo. p. 98 at lines 15 to p. 99 at line 12); and

(3) a white co-worker (Jim) used the term "boy" in reference to Alexander on three occasions (Alexander says it happened about 5 times but could only recount three times). (Alexander Depo. at p. 93 at line 24 to p. 94 at line 3; p. 95 at lines 1-10; p. 96 at lines 3-22; p. 97 at lines 11-19; and p. 98 at lines 7-14).

A review of the cited deposition testimony reveals that Alexander was never clear on exactly when or how these incidents occurred.  It is also critical to note that during the course of Jan Funderburk's interviews, no other black employee reported that any individual was using the term "boy" in reference to black employees.  (Exhibit "A" of Funderburk Aff.).  On the contrary, it was reported and Alexander admits that Alexander himself made the statement "call me boy" during his verbal altercation with Mr. Chance.  (Exhibit "A" of Funderburk Aff.; Alexander Depo. p. 144 at lines 8-15).

The Eleventh Circuit has explained that there are "[f]our factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment".  *Gullatte v. West Point Stevens, Inc.,* 100 F.Supp.2d 1315, 1322 (M.D. Ala. 2000) (citing *Mendoza v. Borden,* 195 F.3d 1238, 1246 (11th Cir. 1999)).  The factors are as follows:

(1)    the frequency of the conduct;
(2)    the severity of the conduct;
(3)    whether the conduct is physically threatening or humiliating,
        or a mere offensive utterance; and

(4)    whether the conduct unreasonably interferes with the employee's job performance.

(Id.)

The test for determining whether harassing conduct is sufficiently severe or pervasive incorporates both a subjective and an objective component.  *Mendoza,* supra, 195 F.3d at 1246. The simple utterance of an epithet that creates a sense of offensive feelings in an employee does not implicate Title VII.  See *Harris v. Fork Lift Systems, Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Isolated general racial remarks "are not *direct* evidence of discrimination because they are either too remote in time or too attenuated because they were not directed at the plaintiff[.]"  *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1291 (11th Cir. 1998)(Emphasis in original).  "[S]imple, teasing offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Baker v. Alabama Department of Public Safety,* 296 F.Supp.2d 1299, 1309-10 (M.D. Ala. 2003)(quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Further, Title VII is used to address discrimination, not "harsh treatment at the workplace."  *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir. 1984).

When applying the pertinent law to the facts as presented by Alexander, even discounting the tremendous credibility issues that exist with his testimony, Alexander cannot create a genuine issue of material fact that he suffered a hostile work environment.  The Eleventh Circuit has explained that "[r]acial slurs spoken by co-workers ha[ve] to be so 'commonplace, overt and denigrating that they create [ ] an atmosphere charged with racial hostility.'"  *Edwards v. Waller Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting *EEOC v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 (11th Cir. 1990)).  The Eleventh Circuit authority is clear that the workplace must be permeated with discriminatory "intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the employment and create an abusive working environment"

before Title VII is violated.  See Harris, supra, 510 U.S. 17.  Alexander cannot meet that burden here.

In the case of Barrow v. Georgia Pacific Corporation, 144 Fed.Appx. 54, 57 (11th Cir. 2005), the Eleventh Circuit held that seven employees failed to establish that the harassment was sufficiently severe or pervasive to alter their working conditions when the evidence showed that there were rebel flags on work equipment, the letters "KKK" on a bathroom wall, a noose in an employee's locker and racial slurs including the use of the "n" word three times in one year, use of the word "boy" repeatedly and someone saying they were going to kick [plaintiff's] "black ass.".  Additional offensive racial comments included another supervisor using the "n" word, an employee being told that if he looked at "that white girl, he would be cut," an employee being called "black boy," and an employee being called "dumb ass."  (Id.)  The Barrow court held as follows:

> Although the symbols and slurs about which he complains were discriminatory and offensive, [the plaintiff] has not presented evidence that the workplace was "permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'"  Harris, 114 S.Ct. at 370. [The plaintiff] has presented evidence of isolated, sporadic incidences of racial harassment over his more than fourteen years of employment with [the defendant].  The district court properly granted summary judgment against [the plaintiff's] hostile work environment claim.

> Upon a review of the record, we conclude that the allegations of the other employees are less substantial - both in terms of frequency and offensiveness - than those of [the plaintiff].  Some allege that they saw the letters "KKK" and confederate flag decals, and suffered isolated, sporadic racial slurs.  Nothing in the record shows that this offensive conduct occurred on a continuous basis or even for a short and intense period.  Instead, the record reflects that these few comments occurred randomly throughout the employment.  The allegations do not meet the standard of severe and pervasive harassment.  See, e.g., Harris, 114 S.Ct. at 370; (other citation omitted).  The district court, therefore, properly granted summary judgment.

*Barrow*, 144 Fed.Appx. at 58.[12]

Recently, a Florida district court found that although cursing and racial comments complained of by the plaintiff were offensive, the plaintiff had not presented evidence that the conduct was sufficiently severe or pervasive to alter the terms or conditions of his employment.

See *Perez v. Pavex Corporation,* 2007 WL 4105833 (M.D. Fla.).  In holding such, the Court stated:

> A plaintiff must establish not only that he subjectively perceived the environment as hostile and abusive but also that a reasonable person would perceive the environment as hostile and abusive, considering the totality of the circumstances.

*Perez,* 2007 WL 4105833 at *3 (citations omitted); see also *Smith v. Beverly Health and Rehab Services, Inc.*, 978 F.Supp. 1116, 1122 (N.Div. Ga. 1997)(finding no hostile work environment claim where a supervisor said "all that mooly can do is make coffee and bring it to me", "these goddamn Georgia niggers think they own Georgia", and "where I came from niggers know their place" because the comments 'did not rise to the level of severe and pervasive racial harassment.')

In the present case, Alexander's testimony related to the alleged random use of the word "boy" on sporadic occasions over a two year term of employment.  There is no testimony that the comments were made in an intimidating, threatening manner or made while berating Alexander regarding his job performance.  Alexander can only recall three occasions where his supervisor used the term, three occasions when a co-worker used the term and one occasion when another co-worker used the term.  See e.g. *Carpenter v. Kelley Foods of Alabama, Inc.*, 2005 WL 3277094 (M.D. Ala.)(holding that even when statements are severe, the infrequency of the comments can negate a finding that the work environment was altered).  Moreover, even if the conduct was frequent, Plaintiff must establish the other elements, such as interference with his ability to work.  Here, Plaintiff does not demonstrate that he was unable to do his job as a result of the alleged comments.  See *Mendoza,* supra, 195 F.3d 1238.  The alleged comment about the noose did not

---

[12]  The Court noted that the employees either failed to take full advantage of the employer's hostile environment policy against harassment and/or that the company responded appropriately to the complaint. The Court held that most of the plaintiffs failed to demonstrate a basis for holding the company liable and further held that there was not an actual hostile environment claim.

bother Alexander enough to include it in his EEOC charge where he made the specific allegations regarding the term "boy" and there is no evidence that the comment was about him or made to him. (See EEOC Charge; see also Alexander Depo. p. 112 at line 14 to p. 113 at line 7).  Certainly, the alleged comment was not made in a threatening manner and it never happened again.  (Id.)  The facts of this case simply do not resemble incidents wherein the Eleventh Circuit has found that a hostile work environment existed.  See e.g., *Noah v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1277 (11th Cir. 2002)(court holding that a racially hostile work environment existed where a foreman used terms such as "wetback", "spic" and "Mexican mother------" in an intimidating and shouting manner three or four times a day).

As for the term "boy," the United States Supreme Court has clarified that standing alone it *could be* evidence of racial animus.  *Ash v. Tyson State, Inc.*, 546 U.S. 454, 126 S.Ct. 1195, 1197, 163 L.Ed.2d 1053 (2006).  However, in the case at hand, Alexander does not know whether the individuals in question used the term to people outside of the protected class, and regardless, there is no evidence that the use of this term permeated the workplace such that Alexander's working condition was altered enough to establish a hostile environment claim.  Assuming all facts in favor of Alexander, the term was only used seven to nine times (he claims Jim McManus used the term five times but could only testify to three time in a two year period.  As such, these comments, if true, may be demeaning and offensive but they are not severe or extreme as those terms have been defined under pertinent case authority.  See e.g. *Buchanon v. Huff & Associates Const. Co, Inc.,* 506 F.Supp.2d 958 (M.D. Ala. 2007)(holding there was insufficient evidence for a racially hostile environment claim where a supervisor stated three racial epithets in a two month period, because the workplace was not permeated with discriminatory intimidation or insult, employees did not complain to supervisor and there was no showing of humiliation or physical threats).

As such, the alleged use of the term "boy" here is not substantial enough to create a hostile work environment claim.  See e.g., *Washington v. Kroeger Company,* 218 Fed.Appx. 822 (11th Cir.

2007) (holding that an employee being called "boy" on multiple occasions was demeaning but not severe or extreme to the point that the comments were pervasive in the employee's conditions of employment).

Any disparate treatment discrimination claim or FLSA claim is due to be dismissed because Plaintiff is not pursuing these claims. To that end, any facts regarding such are not relevant. However, in an abundance of caution, the Board presented those facts and maintains that any job assignment complaints made by Alexander would not be sufficient to establish a hostile environment claim because job assignments do not usually rise to the level of an adverse employment action sufficient to create a hostile work environment. See *McClease v. Alabama Dept. of Corrections*, 2007 WL 3124453 (M.D.Ala.)("To demonstrate that an assignment constitutes as adverse-job action, an employee must show 'a serious and material change in the terms, conditions or privileges of employment.'"); see also *Davis v. U.S. Postmaster Gen.*, 190 Fed.Appx. 874 (11th Cir. 2006)("...in the vast majority of cases, a temporary change in work assignments that creates no tangible harm, and does not alter the employee's permanent job title, is not adverse.") Alexander did not like the change in job assignment but the disagreement is not evidence of discrimination. See *Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998) (potential disagreement does not create a basis to disbelieve an employer's explanation).

Moreover, perhaps Alexander was unaware, but Wingo clarified that any adjustments in assignments were balanced with work changes on the other end. (Wingo Aff. at ¶6). Alexander's perception that his assignments were "more" than his white co-workers is not evidence of discrimination.

As for the time sheet change, it should first be pointed out that even if Alexander could establish that the time sheets were changed, there is no evidence that such was done because of his race. That is, there is no evidence that Wingo was changing the other black custodians' time

sheet.  Moreover, it is undisputed that black and white custodians were actually complaining about Alexander recording false work times on his time sheets.  (Exhibit "A" of Funderburk Aff.).  Further, Wingo denies ever changing a time sheet although he had information that Alexander's time sheets were incorrect.  (Wingo Aff. at ¶8).  Regardless, it is well settled law that an employee cannot establish an FLSA claim based on incorrect time sheets if the employee in fact signed and submitted the time sheets.  See *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972)(holding that employee was estopped from claiming more hours than reported on his time sheet).  Alexander does not deny that he signed all his time sheets in question.  (Alexander Depo. p. 133 at lines 21-22).  As such, even if Alexander looks to work assignments and time sheets to establish a hostile work environment claim, said evidence is not sufficient to meet the Eleventh Circuit threshold for a hostile environment claim.  There is simply no evidence that Opelika City Schools was permeated with racial animus and hostility.  While, if true, Wingo and the co-workers acted inappropriately and offensively, the fact remains that said conduct is not enough to maintain this cause of action.

Based on the foregoing, Alexander fails to present evidence to meet the threshold established by the Eleventh Circuit necessary to make a hostile environment claim.

### E.    PUNITIVE DAMAGES

Alexander cannot be awarded punitive damages against the Opelika City Board of Education on any state law or federal law claims.  See *Ala. Code* § 6-11-26 (1975); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

## IV.
### CONCLUSION

Based on the undisputed facts of this case and precedential case authority, summary judgment is due to be granted on all Alexander's claims against Defendant.  Under the undisputed facts, there is no genuine issue of material fact to be submitted to a jury.

*Wherefore premises considered*, Defendant requests this Court to grant summary judgment in its favor and dismiss all of Alexander's claims against it as a matter of law.

Respectfully submitted this the 10th day of December 2007.

OPELIKA CITY BOARD OF
EDUCATION, Defendant,

By: **/S/James R. Seale**
    James R. Seale (SEALJ3617)
    Elizabeth B. Carter (CARTE3272)
    HILL, HILL, CARTER,
      FRANCO, COLE & BLACK, P.C.
    Post Office Box 116
    Montgomery, Alabama 36101-0116
    (334) 834-7600
    (334) 263-5969 - fax
    E-mail: jrs@hillhillcarter.com
    Counsel for Defendant

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this date electronically filed the foregoing *Memorandum Brief in Support of Motion for Summary Judgment on Behalf of Defendant* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, using the CM/ECF system which will send notification of such filing to: Jeffrey Bennitt, Esquire, (bennittlaw@aol.com)this the 10th day of December 2007.

/S/ James R. Seale
Of Counsel

24