IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTER DIVISION

| | |
|---|---|
| LOUIS ALEXANDER, PLAINTIFF ) | |
| ) | |
| v. ) | CASE NO. 3:06-cv-6-498-WKW |
| ) | |
| OPELIKA CITY BOARD OF EDUCATION., ) | |
| ) | |
| Defendant, ) | |

**MEMORANDUM BRIEF IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF THE DEFENDANT**

**PLAINTIFF'S UNDISPUTED FACTS**

1. Dr. Stan Cox (white) was the principal of Opelika High School during the time of the complaint. (Defendant's exhibit 2, page 179, line 21; affidavit of Dr. Neighbors, page 2). Dr. Funderburke (white) was an assistant principal at the school during the time of the complaint. (Affidavit of Dr. Neighbors, page 2). Dr. Neighbors (white) was the Assistant Superintendent for administration. (Defendant's brief, page 3; affidavit of Dr. Neighbors). Joe Wingo (white) was the maintenance supervisor. (Defendant's brief, page 3).

2. Louis Alexander worked for the defendant for two years as a Custodian. (Defendant's brief, page 20). Mr. Alexander was Black. (Id. at 2). Plaintiff was 35 years old at the time of his termination. (Defendant's exhibit 9, plaintiff's EEOC charge).

3. Plaintiff belongs to a protected group, his race. (Admitted by defendant in brief).

4. Plaintiff was subjected to unwelcome harassment. (Plaintiff reported the harassment to Dr. Cox, Dr. Funderburke, Joe Wingo and Dr. Neighbors–Mr. Alexander reported the harassment

several times to Dr. Funderburke and plaintiff directly told Joe Wingo not to call him "boy"–see below excerpts from plaintiff's deposition supporting this proposition).

5. The harassment was based on his protected group. Plaintiff was referred to as "boy" by his immediate white male supervisor Joe Wingo (Defendant's exhibit 9, para 1) and occasionally by two white co-workers–see below statements from plaintiff's deposition. Plaintiff believed that the term "boy," as used in this case, was racial. (Defendant's ex. 2, at 100, line 7 - 9 and Defendant's exhibit 9, plaintiff's EEOC charge).

6. The harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment: (Defendant's Exhibit 2, plaintiff's deposition and Notarized EEOC charge: see detailed facts below).

**Severe and pervasive racial comments:**

**From Jim McManus (white co-worker):**

a. (Defendant's exhibit 2, plaintiff's deposition, page 94, line 16):

    Q: And he (Jim –white male co-employee) said get your own key, boy?
    A: Yes, ma' am.
    Q: Any other time that Jim said anything to you like that?
    A: All the time. All the time

b. (Id. at 95, line 14):  Q: Okay. And how may times would you say during the time that you worked there that he (Jim) called you boy?
    A: Uhm, he probably did it abut five times...

c. (Id. at 96, line 4):  Q: Okay. Do you have specific – and I have down it was about five times – do you have a specific memory where you could tell us about those five times?
    A: Uhm, yes. I was asked to go to the band room and strip Jim's floor, strip and wax Jim's floor. And he just stand up watching me laughing at me doing all the work. And he said it then.

|  |  |  |
|---|---|---|
|  | Q: | What did he say? |
|  | A: | Started laughing. I just looked at him. Boy. But, that's exactly the way he said it. |
| d. (Id. at 97, line 3): | A. | ...And there was another time he (Jim) did it. Ms. Moore heard it. But I know she would not probably say she did. |
| e. (Id. at 97, line 15): | Q: | He (Jim) just said boy? Like he wasn't saying, boy get me this, or boy, can I talk to you? He just said boy, like for no reason to you or towards you? |
|  | A: | Yes, ma ' am. |
| f. (Id. at 97, line 24) | Q: | Like as opposed to the first time when he said boy – get your own key, boy? |
|  | A: | After that time, he just constantly said it to me |

**From James Chance**:

| e. (Id. at 98, line 15): | Q: | That's fine. Did James Chance (a different white male co-employee than Jim) ever call you boy? |
|---|---|---|
|  | A: | He did one time. |
|  | Q: | All right. And tell me about that? |
|  | A: | ...it was an incident where the supervisor had went in and put – marked me absent when I was at work. And I was trying to find the supervisor to ask him why he did that. |
|  | Q: | Wingo did? |
|  | A: | Yes, ma'am. And I was trying to fid him. And I asked James where he was. And James said, you don't need to see him. You need to see me. And I said, no, I need to see Joe, he's the supervisor. He asked me, what can I help you with? I said, James, I need to see Joe (Wingo). And I walked off from him. And that's when he called me that racial word, ma'am. |
|  | Q: | Just tell me. |
|  | A: | Boy. |

**From Joe Wingo, supervisor**

| f. (Id. at 100, line 20): | Q: | Are you saying that Joe Wingo ever said anything to you that you consider racist? |
|---|---|---|
|  | A: | Yes, ma'am. |
|  | Q: | Tell me what you feel like you consider was racist? |
|  | A: | One night, he said Louie, when your boy get mad with you, |

|  |  |  |  |
|---|---|---|---|
|  |  |  | do he call you boy? |
| g. (Id. at 101, line 8): | Q: | Is he talking about your child? |
|  | A: | Yes, ma'am |
| h. (Id. at 104, line 2) | A. | He began to curse, ma'am. And he called me boy. And I called Joe to the side and talked to Joe about him cursing me and uhm... |
|  | Q: | So, he started cussing you and threw in "boy" there, too, during that incident? |
|  | A: | Yes. |
|  | Q: | And when you say he started cussing you, like what was he – |
|  | A: | Using cursing words, ma'am, and then at the end, he used boy. |
|  | Q: | Okay. And so, you talked to Wingo about it? |
|  | A: | Yes. |
|  | Q: | And what happened? |
|  | A: | He didn't really want to hear what I had to say and walked off from me. And he said – I think he said, I'm not 100 percent sue, but I think he said something racist, too. |
|  | Q: | During that conversation? |
|  | A: | Yes, ma'am |
| i. (Id. at 105, line 6) | Q: | All right. Any other time that Mr. Wingo said or did something racist towards you? |
|  | A: | Yes, ma'am. Like – yes, ma'am. A lot of times. |
| j. (Id. at 106, line 21) | Q: | No, no, no. That's fine. You have answered my question. Is there anything else that you can recall that Mr. Wingo has said to you – not this other stuff - but that he said to you that you found to be or felt was racially derogatory? |
|  | A: | Yes, ma'am. |
|  | Q: | Okay. |
|  | A: | I can't remember the dates. But on a lot of occasions, ma'am, he have did racist things to me and said racist things on plenty of occasions, ma'am. (Id. at 107, line 4). |
| k. (Id. at 107, line 20): | Q: | But I want to give you an opportunity here today to tell me as many occasions as you can recall that he said or did something to you that was racist. And you have told me about some that he said. You have told about time sheets and giving that as an example of whether Mr. Wingo did |

4

|   |   |   |   |
|---|---|---|---|
|   |   |   | something racist. So, did you have a talk with Mr. Wingo about going to see Mr. Funderburke? I mean, I'm tying to – |
| l. (Id. at 111, line 5) | | A: | No, He knew it, because apparently Mr. Funderburke had talked to him. |
| | | Q: | And what did Mr. Wingo say to you? |
| | | A: | At first, he didn't say nothing. He was just real upset. And then that's what he called me boy, again. |
| m. (Id. at 111, line12): | | Q: | And what did he say to you? What was the sentence that he said to you? |
| | | A: | I think – actually, I know exactly what it was. He told me to go in front of the building and pick some paper. I looked him. I said, okay. He said, boy. I just walked off from him. |
| n. (Id. at 111, line 24): | | Q: | Okay. Any other occasions when Mr. Wingo said something to you that you consider to be racist? |
| | | A: | Yes. It was – a lot of occasions where he would come back at night and say racist things. (Id. at 112, line 4). |
| | | A: | Stuff like "boy", ma'am. Stuff like how you hang somebody and stuff like that, ma'am. (Id. at 112, line 8). |
| | | Q: | What? |
| | | A: | Yes. |
| o. (Id. at 112, line 13): | | Q: | What did you say? |
| | | A: | Like a noose. He was saying stuff like "boy", and how you tie a noose around somebody's neck. |
| | | Q: | Okay. And what did he say about the noose? |
| | | A: | Uhm, he was telling him like he have seen stuff where people have did horrible things like tie a noose around your neck. And then he would look at me and start laughing |
| p. (Id. at 112, line 24): | | Q: | Okay. And how many times did he talk to you about a noose? |
| | | A: | I think – that was the only occasion he talked to me abut a noose. That occasion. |
| | | Q: | Was he talking about hanging black people or anything like that? |
| | | A: | He didn't say either one, ma'am. |
| | | Q: | Okay. Any other thing you want to tell us about that he said? |
| | | A: | I think I told you all the time that he – |

q. (Id. at 113, line12):  Q: Okay. All right. Now, we have talked about work assignments that you said were unfairly assigned to you away from the white individuals when they would complain about not wanting to do the job. Is that fair?
A: Yes, ma'am.
Q: And you told me abut the boys' bathroom and the science building and weed eating at the stadium, and then Saturday morning the white people being allowed to stand around while you cleaned the stadium?
A: Correct
Q: And you had to wax their area?
A: Yes. (Id. a 114, line 1).

r. (Id. at 114, line 2):  Q: So, I have those five things. Are there any other things, specifics, that you can tell us about where you believe that you and/or the other Black employees were made to do the White employees' work?
A: It was just that this occur all the time, ma'am, all the time.

s. (Id. at 133, line 1):  A: I would ask him about it.
Q: Okay. What would you say?
A: I would be like, Joe, this is not correct. This is not right. These hours is not right.
Q: And what would he say?
A: Nothing. Nothing. But I know there was occasions once – one occasion where he called me that word again, because–
A: Called me boy, because I told him that I was going to tell Mr. Funderburke and them again about this.

t. (Id. at 144, line 8):  Q: Did you ever say to James in front of others on any occasion, why don't you just call me boy?
A: I think so. I think so. Yes, I did.
Q: And when did that occur?
A: I don't remember when it was. But, yes, I said that.

u. (Id. at 170, line 7): Q: And in your Charge of Discrimination, you put that Mr. Wingo referred to you as a boy, and that Mr. Chance had referred to you as a boy; is that correct?
A: Yes.

v. (Defendant's ex. 9 EEOC charge, para 1:  "I am an African-American male citizen of Lee County, Alabama. I worked for the Lee County School System in the cleaning crew at

|   |   |
|---|---|
|   | Opelika High School form October 2003, until my termination on October 25, 2005.  During the time I was employed, my supervisor, Joe Wingo, would refer to me and other Black employees as "boy."  Another white employee, James Chance, also called me and other Black employees "boy." |
| w.  (Defendant's ex. 9 EEOC charge, para 2: | "My supervisor has constantly required me and other Black employees to perform the work of the White employees.  My supervisor has also taken time away from me by making me absent on days when I was at work.  The same supervisor would mark White employees as present, even if they were not at work." |

7.  That a basis for holding the employer liable exists:     **The report of harassment by Mr. Alexander:**

| | | | |
|---|---|---|---|
| a. (Id. at 135, line 18): | Q: | ...I know that you went to Mr. Funderburke. | |
| | A: | Uh - huh. | |
| b. (Id. at 135, line 22): | Q: | ...We know you went to Stan Cox once? | |
| | A: | Yes. | |
| c. (Id. at 136, line 4): | Q: | How many time did you complain to Mr. Funderburke? | |
| | A: | Ma'am, a lot of times. | |
| d. (Id. at 136, 10): | Q: | The first time was I went and saw him about the bathroom, when he had gave me Jim's bathroom.  And I told him what he did and what he said and when he called me - he  - I told him that Jim did not want to clean the bathroom. And he gave the bathroom to me because Jim did not want to clean it.  And I told him that – that Joe called me racial words like boy and stuff. | |
| e. (Id. at 136, line 23) | A: | He (Funderburke) said he would talk to Joe (Wingo). | |
| f. (Id. at 138, line 4): | Q: | When did you start complaining? | |
| | A: | After he (Wingo) continued to say those  – call me boy and give me the jobs of the white employees  – the job that they did not want. | |
| g. (Id. at 139, line 5): | Q: | Would the summer of 04 have been the first time you talked to Mr. Funderburke? | |
| | A: | Yes. | |

h8. (Id. at 160, line 1):   Q:   Did you ever have conversations with Mr. Neighbors about your complaints?
　　　　　　　　　　　　　　A:   Yes.
　　　　　　　　　　　　　　Q:   Before you were terminated?
　　　　　　　　　　　　　　A:   Yes.

I. (Id. at 161, line 5):   Q:   What did you tell him (Neighbors)?
　　　　　　　　　　　　　　A:   I told him about how I was being treated all the things that was being said.

j. (Id. at 161, line 9):   Q:   Could you tell me what you said when you say, I told him about how I was being treated and about what was being said, what did you tell him had happened to you?

　　　　　　　　　　　　　　A:   I told him (Neighbors) that Joe Wingo was doing racist things like giving me all the assignment of Jim – and I said specifically Jim and James' jobs. And I told him that this guy (Wingo) was calling me boy.

k. (Id. at 161, line 18):   Q:   Did you say he (Wingo) was doing racist things, or did you tell him (Neighbors) that you had to do Jim and James' job?
　　　　　　　　　　　　　　A:   I told him all that, ma' am.
　　　　　　　　　　　　　　Q:   You told him that Jim Wingo was doing racist things?
　　　　　　　　　　　　　　Q:   Yeah. And then I told him what he was doing, the racist things that he was doing.

l. (Id. at 162, line 2)   Q:   And is it your testimony that you told him in that conversation that Joe Wingo called you boy?
　　　　　　　　　　　　　　A:   Yes.
　　　　　　　　　　　　　　Q:   Anything else?
　　　　　　　　　　　　　　A:   That's it.
　　　　　　　　　　　　　　Q:   Okay. So, you told him you're getting the white employees' job assignments?
　　　　　　　　　　　　　　A:   yes
　　　　　　　　　　　　　　Q:   You did tell him, that, for Jim and James?
　　　　　　　　　　　　　　A:   Yes, yeah.
　　　　　　　　　　　　　　Q:   And that you were being called boy?
　　　　　　　　　　　　　　A:   Yes.

m. (Id. at 163, line 13):   Q:   Are you confident sitting here today that you ever used the word "race" when you were talking to him (Neighbors) on the phone?

|   |   |   |   |
|---|---|---|---|
|   |   | A: | Yes, ma' am. |
| n. (Id. at 163, line 17): | | Q: | When is the next time you complained to him (Neighbors)? You said there was twice? |
| | | A: | Well, when he called me over there, it was with a meeting, he wanted to talk with me about what happened. And I told him again. |
| | | Q: | What happened that he called? You said he wanted to talk to you about what happened. |
| | | A: | Oh, they had suspended me and recommended that I be terminated. And he called me over there to talk to me. |
| | | Q: | And he wanted to talk to you before he took action on the recommendation? |
| | | A: | Yes. |
| | | Q: | And what was said during that conversation? |
| | | A: | Again, I told him about being call boy, and about doing all of James' and Jim's assignments. |
| o. (Id. at 164, line 14) | | Q: | And what did he say in that conversation? |
| | | A: | He wrote down everything I said and said that he was going to check into it. |
| p. (Id. at 164, line 19): | | Q: | Okay, so, other than Mr. Funderburke and Mr. Neighbors and then on one occasion you said you talked to Stan Cox? |
| | | A: | Yeah. |
| q. (Id. at 165, line 5): | | Q: | And what did you tell him (Cox)? |
| | | A: | The first thing that came out of my mouth was, I told him doing the racist – doing the – all the white employees job being put on me. And then I told him about the supervisor (Wingo) calling me boy. |
| r. (Id. at 184, line 4): | | Q: | When you went to Mr. Funderburke – who I understand from you went to more than once? |
| | | A: | Correct. |
| | | Q: | And were your complaints pretty much the same that you were doing the white employees' work, and they were referring to you as boy? |
| | | A: | Yes, ma' am. |

8. The failure to take prompt remedial action: **No investigation, nothing was done.**

a. (Id. at 167, line 7):     A:     Because he – he fired me after – they fired me after I

|  |  |  |
|---|---|---|
|  |  | reported all of this. |
| b. (Id. at 173, line 1): | Q:<br>A: | What date were you terminated?<br>Ma am, right after I talked with Stan Cox and called Dr. Neighbors, I was terminated probably like a week after that, ma' am. Or less. |
| c. (Id. at 179): | Q:<br><br>A:<br>Q:<br><br>A: | Do you know who made the decision that you would be terminated?<br>No.<br>Do you know who recommended that you be terminated initially?<br>I think Mr. – Dr. Raley, I think. Dr. Raley and Mr. Neighbors – Dr. Neighbors. |
| d. (Id. at 187, line 3): | Q:<br><br>A: | Do you know whether or not Dr. Neighbors or anyone in the central office conducted an investigation?<br>I don't know. |
| e. (Defendant's brief, page 11): |  | The defendant denies that Mr. Alexander ever reported race harassment according to the administrators involved: Funderburke Aff. at #16, Neighbors Aff. a #5, 8, Neighbors Aff. at #11). |
| f. (Defendant's exhibit 9, para 3): |  | "I complained about this racially unfair treatment to the principal, Stan Cox, the assistant principal, James Funderburke, and my supervisor, Joe Wingo. I was told that if I did not like treatment I was receiving, then I could go work somewhere else. |

## ARGUMENT

### PRIMA FACIA CASE AND LACK OF AFFIRMATIVE DEFENSE

To prove harassment under Title VII, a plaintiff must show (1) that he belongs to a protected group; (2) that he has been subjected to unwelcome harassment; (3) that the harassment was based on his protected group; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists. Johnson v. Booker T.

Washington Broad Serv., 234 F.3d 501 (11th Cir. 2000).

(1). Plaintiff belongs to a protected group, his race. (Admitted by defendant in brief)

(2). Plaintiff showed that the harassment was unwelcome because he reported it to three different administrative persons, Neighbors, Cox and Funderburke, and he specifically told Joe Wingo to stop.

(3). That the harassment was based on his protected group. Plaintiff says it was racial and his belief is supported by the number of times and ways he was called boy by white employees. McKinney v. Dole, 765 F.2d 1129, 1138-1139 (D. C. Cir. 1985): Harassment of an employee that would not occur but for the employee's race, color, sex, national origin, age, disability, or religion is unlawful. Plaintiff is Black, the supervisors are White. It appeared to plaintiff that the work assignments were being unfairly distributed and always, in that regard, he was being called "boy" do this or "boy" do that, or just plain boy. Specifically, Joe Wingo asked him if his own child called him "boy."

(4) Plaintiff's own testimony (Defendant's exhibit 2) shows that the use of the term "boy" was constant. There are also several examples of how it was used during the course of the employment to give the employment an offensive and insulting atmosphere. Frederick v. Sprint/United Management Company, 246 F.3d 1305 (11th Cir. 2001): must show severe and pervasive.

(5) Burlington Indust., Inc. V. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 807 (1998). If the employee only suffers harassment, but no adverse employment action in addition to harassment, then the employer is not liable if the employer had a clear and distinct harassment policy in effect and the employee failed to use it to give the

employer adequate notice to stop the harassment.   Under Hulsey v. Pride Restaurants, LLC, No. 03-1196) (11th Cir. 04/27/2004)] the affirmative defense must be argued.  Simply stating its there is insufficient.  The defendant has failed to argue the affirmative defense.  Thus, they cannot avail themselves of it.   In Hulsey v. Pride Restaurants, the court stated: "For whatever reason, Pride has not argued in this Court that Hulsey's failure to utilize its internal reporting procedures entitles it to summary judgment on her hostile environment theory. Pride's brief does highlight evidence of its policy against sexual harassment and contends that because Hulsey never reported Garrison's conduct, she failed to prove her hostile environment theory. That argument, however, goes to Hulsey's burden of showing that the harassing conduct was sufficiently severe and pervasive. It does not express or imply that Pride carried its own burden of establishing the Faragher-Ellerth affirmative defense."

   In any event, the defendant does not have a clear and concise policy against race harassment.  It does have a clear policy against sex harassment (Plaintiff's one), but, nowhere in it does it mention race harassment.  In the sex harassment policy it tells the harasser to report to their supervisor or to the Superintendent for Administration or the Superintendent.   There is a generic anti-harassment policy. (Plaintiff's two).   It is far from clear and precise.  It does, however, tell the person that if they believe they have been discriminated against, they are to report it to Dr. Neighbors, which the plaintiff did, anyway.  Finally, there is a generic grievance procedure.  The person to be seen to start the grievance procedure is the principal or one can look it up in manuals kept in the principal's office. (Plaintiff's exhibit 3).  The plaintiff went to both the principal and the assistant principal with his complaints.   The policy states that upon request, the principal will give the employee a written copy of the grievance procedure.  According to

Mr. Cox (Defendant's exhibit 6) Mr. Alexander never came to him with a grievance. Mr. Alexander says that he came to him twice. Plaintiff was told, as seen in his charge to EEOC, that if he did not like it, he could just leave. Frederick v. Sprint, 246 F.3d 1305 (11th Cir. 2001) states that this type of language is a threat and that as such, it creates a dispute on the failure to use the policies.

While the failure to have a written policy is not fatal in all cases, in this situation where we are dealing with a school board, which should know better, the employer is automatically liable where there is no policy or where there is an ineffective or incomplete policy; the employer remains liable for conduct that is so severe and pervasive as to confer constructive knowledge. Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).

SEVERE AND PERVASIVE

In Hulsey v. Pride Restaurants, LLC, No. 03-1196) (11th Cir. 04/27/2004), to be actionable under Title VII, *a hostile work environment must be both "objectively and subjectively offensive*, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787, 118 S. Ct. at 2283; Mendoza, 195 F.3d at 1246. In assessing whether harassment is objectively severe and pervasive, courts typically look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. Faragher, 524 U.S. at 787-88, 118 S. Ct. at 2283; Johnson, 234 F.3d at 509; Mendoza, 195 F.3d at 1246.

In O'Rourke v. City of Providence, 235 F.3d 713 (1st Cir. 2001), the court stated that acts of harassing conduct that are not explicitly sexual in nature, but that undermine an employee's

ability to succeed at her job, should be considered along with overtly sexually abusive conduct in assessing whether there is a hostile environment. The employer was not entitled to a jury instruction that the firefighters' alleged harassing conduct should be evaluated in the context of a "blue collar" environment.  This case is important because the emphasis of the defendant in their brief is that "boy" is less deplorable than "n_____" and that a 35 year old Black man being referred to as  "boy" at work *would* have to show more to overcome the severe and pervasive burden.

That was the law in the Eleventh Circuit.  That law was changed by  Ash v. Tyson State, Inc., 546 U.S. 454 (2006).  The Supreme Court stated that standing alone the term "boy" could be evidence of racial animus.  Mr. Alexander testified to several examples of how the term"boy" was being employed.  In addition to the examples, he stated that it occurred  constantly.  He stated that he was referred to as "boy":

> he just constantly said it to me (McManus, fact f); a lot of times (Wingo, fact i); said racist things on plenty of occasions, ma'am (Wingo, fact j); It was just that this occur all the time, ma'am, all the time (Wingo, fact r); Mr. Wingo referred to you as a boy (Wingo, fact r); My supervisor has constantly required me and other Black employees to perform the work of the White employees (Wingo, fact w); And I told him that – that Joe called me racial words like boy and stuff (Report, fact d); call me boy and give me the jobs of the white employees (Report, fact e); And I told him that this guy (Wingo)  was calling me boy (Report, fact j); Again, I told him about being call boy (Report, fact n); And then I told him about the supervisor (Wingo) calling me boy (Report, fact q); And were your complaints pretty much the same that you were doing the white employees' work, and they were  referring to you as boy (Report, fact r)

This occurred in the context of work, meaning, that he was being insulted  with "boy" do this, or "boy" do that.  Alexander also has shown that the term "boy" was used in combination with cursing.  Cursing, by itself, is not harassment in the legal sense.  However, when combined with "boy", it becomes highly insulting.  When used in the context of work, it interfere's with the

14

employees ability to work.  The "blue collar" defense is simply not available.

The defendant claims in their brief that he only told them about three episodes of boy calling and one episode about a noose in his deposition.  That is highly disputed.   Mr. Alexander has cited to this court all those excerpts from the deposition that create a jury question on whether or not the use of the word "boy" altered the working environment such that there was a violation of Title VII.  Mr. Alexander has cited to this court several instances where he shows that he wasn't just called "boy" on occasion, but, was in fact, referred to as "boy" and he was told this in an insulting manner, laughed at and cursed, scorned and demeaned, a lot of times, all the time, constantly, a whole lot of times.

A single "incident" of harassment can be severe and pervasive:  Scarbrough v. Board of Trustees Florida A&M University, no. 07-10195 (11th Cir. Oct 22, 2007).  A "single" incident - can support a claim of hostile work environment because the "frequency of the discriminatory conduct" is only one factor in the analysis. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (noting that "no single factor is required"). Conduct is actionable if it is either "sufficiently severe or pervasive." Meritor, All U.S. at 67 (emphasis added). Indeed, the Supreme Court recently noted that an isolated incident can amount to a "discriminatory change[ ] in the 'terms and conditions of employment'" when the incident is "extremely serious." Breeden, 532 U.S. 268, 121 S.Ct. at 1510, 149 F.ED.2d 509 (citation omitted). Other circuits have come to a similar conclusion.

There are work environments where the "blue collar" language is acceptable.   After all, Title VII is not a "general civility code."  But, when cursing and well known racial terminology are combined, and directed, and slung, the atmosphere of the work environment is altered.  Miller

v. Kenworth of Dothan, Inc., 277 F.3d 1269 (11th Cir. 2002).  Are these simple teasings, as the defendant says in their brief (page 17)?  Or are they fighting words, as the plaintiff infers?  That is for a jury to decide.

In Steiner v. Showboat Operating Co., 25 F.3d 1459 (9th Cir. 1994), a supervisor's ongoing comments including offensive sexual remarks was enough to find a hostile work environment, in spite of the fact that he consistently abused all of the employees.  Here, the remarks were directed at plaintiff, not merely stated where plaintiff could hear them.

In Martinez v. Bohls Bearing Equip. Co., 361 F. Supp. 2d 608 (W.D. Tex. 2005). The company president allegedly made the following or similar comments on a daily basis: "Do it like a white man, not like a Mexican"; and "The only things Mexicans are good for are having babies and getting welfare, and that comes out of my pocket." The Hispanic plaintiff testified that he com*plained about these comments, to no avail. Although the president denied making the com*ments, the court ruled that there was enough evidence to present this question to a jury. In particular, the court stated that the plaintiff's evidence suggested a work place "so heavily polluted with discrimination' as to create a hostile working environment."

In Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269 (11th Cir. 2002), the court found national origin (Spanish) harassment in that they stated it was clear that these incidents were humiliating and degrading to Miller.

In Vance v. Southern Bell Telephone and Telegraph Company, 863 F. 2d 1503, the court ruled, "that the determination of whether the defendant's conduct is sufficiently 'severe and pervasive' to constitute racial harassment does not turn solely on the number of incidents alleged by the plaintiff...drawing a formal line between 'isolated incidents' and a 'pattern of harassment' is

16

not helpful to the analysis: the plaintiff need not prove that the instances of alleged harassment were related in either time or type. Rather, all that the victim of racial harassment need show is that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to do his or her job.

In Day v. Colt Constr. & Dev. Co., 28 F.3d 1446 (7th Cir. 1994), a series of offensive comments over a period of years was enough to find a hostile work environment.

In Dudley v. Wal-Mart Stores, No. 97-6416, Feb. 9. 1999, plaintiff made out claim for harassment by showing "several instances of racial harassment of coworkers, including people in a supervisory capacity

In Parrish v. Immanuel Medical Center, 92 F.3d 727 (8th Cir. 1996), they made her work intolerable by reducing her work load, giving her insufficient office space.

Lewis v. Federal Prison Industries, Inc., 786 F.2d 1537 (11th Cir. 1986) involved a case of harassment because of the plaintiffs's age. The district court found that the harassment consisted of mostly direct verbal abuse--upbraiding him in front of others, isolating Lewis from the other employees, advising other employees not to have anything to do with plaintiff, criticizing his work, taking away his chair, putting his desk in an open area away from other employees, disciniplinary write ups, and finally, a poor evaluation.

In Watkins v. Bowden, 1054 F.3d 1344, 1362 (11th Cir. 1997), the court found race harassments over a series of racial comments.

The court in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 64 (1986) stated that "the phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women."

In Cross v. Alabama, 49 F3d 1490, (11th Cir. 1995), the court stated that the act of hostile communication, aggressive, demeaning attitude, derogatory remarks about women in front of others, repetitiously done, can become a cause of action under Title VII for sex harassment.

The cases cited by the defendant to support their position are simply inapposite to the plaintiff's position. Those cases deal with the general use of derogatory phrases, cursing and the like. These phrases were not generally used. They were directed. They were meant to hurt. They were meant to alter the terms of plaintiff's work environment. And they did.

/s/ Jeff Bennitt
_____
Jeffrey W. Bennitt ASB N51J
BENOO4

Jeff Bennitt & Associates, LLC,
121 Edenton St.
Birmingham, Al   35242        e-mail: Bennittlaw@aol.com
408-7240–office
408-9236–fax
213-8228–cell

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above was efiled on December 30, 2007.

Elizabeth Carter, Esq.
James R. Seale. Esq.
HILL, HILL, CARTER
PO Box 116
Montgomery, Ala   36101-0116

/s/ Jeff Bennitt
_____