IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LOUIS ALEXANDER,                )
                                )
        Plaintiff,              )
                                )
        v.                      )        Case No. 3:06-cv-0498-WKW
                                )
OPELIKA CITY                    )
BOARD OF EDUCATION,             )
                                )
        Defendant.              )

## MEMORANDUM OPINION AND ORDER

This cause is before the court on Defendant Opelika City Board of Education's ("School Board") Motion for Summary Judgment.  (Doc. # 36.)  Louis Alexander ("Alexander"), a former custodian at Opelika High School, brings one claim of hostile work environment in violation of Title VII of the Civil Rights Act of 1964.[1]  (Compl.)  For the reasons set forth below, the defendant's motion for summary judgment is due to be granted.

## I.  FACTS AND PROCEDURAL HISTORY

Alexander is a black male who was employed as a ten-month, eight-hour-per-day custodian at Opelika High School, from November 13, 2003, until his effective termination on November 16, 2005.  During his two years of employment with the School Board, Alexander was at all times a probationary employee.  At the time of his termination,

---

[1] Although the plaintiff originally also brought claims for race discrimination, retaliation, a violation of the Fair Labor Standards Act, and negligent supervision, he has now abandoned these claims and only pursues his hostile work environment claim.  (*See* Doc. # 36-2; Def.'s Reply Br. 1.)

Alexander was thirty-five years old.

Alexander claims the racial harassment to which he was subjected at work primarily consisted of two co-workers and his supervisor calling him "boy." (Pl.'s Resp. Br. 2.) Alexander claims that a white co-worker, Jim McManus ("McManus"), called him "boy" about five times. (Alexander Dep. 95:14-18.) On one occasion, when Alexander asked him for a key, McManus said "get your own key boy." (*Id.* at 93:23-94:3.) On a second occasion, Alexander claims while he had to "strip and wax Jim's floor," McManus stood there, laughed at him, and just said "boy."[2] (*Id.* at 96:3-22.) On a third occasion, Alexander claims that one night outside of the band room, McManus just said the word "boy" for no apparent reason and without saying anything else. (*Id.* at 97:10-19.) Alexander "can't remember exactly when or where" the other two occasions McManus called him "boy" took place. (*Id.* at 98:13-14.)

Alexander claims that another white co-worker, James Chance ("Chance"), called him "boy" once. (*Id.* at 98:15-17.) On that occasion, after Alexander had a brief conversation with Chance about finding their supervisor, Chance allegedly called him "boy" as Alexander walked away. (*Id.* at 98:2-12.) For an unexplained reason, although perhaps an attempt at provocation, it also appears that Alexander invited use of the term when he told Chance, "why don't you just call me boy." (*Id.* at 144:8-12.)

Finally, Alexander claims that his white supervisor, Joe Wingo ("Wingo"), used the

---

[2] When asked what McManus said, Alexander responded, "Started laughing. I just looked at him. Boy. But that's exactly the way he said it." (Alexander Dep. 96:13-16.)

term or called him "boy" many times, (*id.* at 107:4-7), but can provide specifics for only about five occasions. Once, Wingo allegedly asked Alexander, "when your boy get mad with you, do he call you boy?" (*Id.* at 101:1-7.) A second time, it appears that while Wingo was cursing at Alexander, he also called him "boy." (*Id.* at 104:2-5.) On a third occasion, after Wingo told Alexander to pick up some paper, he said "boy." (*Id.* at 111:14-18.) On a fourth occasion, after Alexander questioned him about the entries on his time sheet and disputed their accuracy, Wingo allegedly called him "boy." (*Id.* at 133:13-15.) Finally, on the fifth and most serious occasion, Alexander claims Wingo called him "boy" while talking about "how you tie a noose around somebody's neck."[3] (*Id.* at 112:8-16.) Wingo was apparently talking to someone else and "telling him like he have seen stuff where people have did horrible things like tie a noose around your neck." (*Id.* at 112:19-22.) Wingo allegedly looked at Alexander after saying this and laughed. (*Id.* at 112:22-23.) When asked during his deposition if Wingo had been "talking about hanging black people or anything like that," Alexander stated that "[h]e didn't say either one." (*Id.* at 113:6-7.)

Although seemingly made for the purposes of his abandoned claims, Alexander also alleges generally that Wingo made the black custodians do more work than the white custodians. (*Id.* at 58:4 - 59:21.) However, the other black custodians never complained of this, (Funderburk Aff. ¶ 7), and, in fact, one actually recalled a specific time when Alexander did not do the work he was assigned. (Doc. # 36-5, at 12.) Alexander also claims there were

---

[3] Alexander never mentioned this in his EEOC Charge of Discrimination. (Alexander Dep. 170:13-15.)

some days when he worked and Wingo took the entire day off the time sheet. (Alexander Dep. 170:16 - 171:25.) However, Alexander cannot point to a specific date when this happened and admits to signing all of his time sheets anyway.[4] (*Id.*)

Alexander called the assistant superintendent in August 2005 to complain about a black assistant principal who had asked him to pick up some crumbs on the floor of the school. Alexander was upset at the request because he felt it was not his responsibility. He never mentioned any incidents where racially derogatory words were used. (Neighbors Aff. ¶ 5.) Shortly thereafter, in September 2005, Alexander and Chance had a verbal altercation. (*Id.* ¶ 6.) Because of the altercation and "other problems," the principal recommended Alexander's termination to the assistant superintendent in a letter dated October 3, 2005. (*Id.*) The assistant superintendent had Alexander's co-workers interviewed so as to have more information as he considered the termination request.

The interviews revealed that at least two black female co-workers felt threatened by

---

[4] The allegation was discussed as follows during Alexander's deposition:

Q:     So, he just made up that you didn't come to work all day, and you signed the paper?
A:     Ma'am –
Q:     I'm sorry. That sounds a little outlandish. I'm trying to understand how that worked. He would go in and mark it up and pretend like you weren't there?
. . .
A:     Yes.
Q:     And then you would sign it?
. . .
A:     Yes.

(Alexander Dep. 171:12-25.)

4

and were afraid of Alexander. (Doc. # 36-5, at 10-13.) Additionally, McManus reported that Alexander had threatened to beat him up, and many other co-workers, both white and black, complained of Alexander's work. (*Id.*) Finally, after reviewing the information and meeting with Alexander in person, the assistant superintendent recommended that Alexander be fired primarily because of "his inability to work effectively with others and . . . because of an increased level of agitation and aggression toward other employees." (*Id.* at 8.) The School Board accepted the superintendent's recommendation on October 25, 2005, and voted to make Alexander's termination effective November 16, 2005.

Alexander filed a Charge of Discrimination with the EEOC on November 4, 2005. On March 9, 2006, the EEOC issued a Right to Sue letter. Alexander filed his Complaint (Doc. # 1) with this court on June 2, 2006. The School Board filed its summary judgment motion (Doc. # 36) on December 10, 2007, to which Alexander responded (Doc. # 40) and the School Board replied (Doc. # 44).

## II. JURISDICTION AND VENUE

Because this case arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations supporting both.

### III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if a "'reasonable jury could return a verdict for the non-moving party.'" *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *United*

6

*States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  After the

nonmoving party has responded to the motion for summary judgment, the court must grant

summary judgment if there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## IV.  DISCUSSION

### A.    *Hostile Work Environment*

In order to establish a hostile work environment claim, a plaintiff must show the

following elements:

> (1) that he belongs to a protected group; (2) that he has been subject to
> unwelcome harassment; (3) that the harassment must have been based on a
> protected characteristic of the employee, such as [race]; (4) that the harassment
> was sufficiently severe or pervasive to alter the terms and conditions of
> employment and create a discriminatorily abusive working environment; and
> (5) that the employer is responsible for such environment under either a theory
> of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  It is the fourth

element – sufficiently severe or pervasive harassment – that "tests the mettle of most . . .

harassment claims," *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), and

Alexander's claim is no exception.  Alexander argues the harassment to which he was

subjected was being called "boy" eight to eleven times during the two years of his

employment.  (Pl.'s Resp. Br. 35.)

The "'mere utterance of an . . . epithet which engenders offensive feelings in an

employee' . . . does not sufficiently affect the conditions of employment to implicate Title

VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)). "[R]acial slurs allegedly spoken by co-workers ha[ve] to be so 'commonplace, overt and denigrating that they create[ ] an atmosphere charged with racial hostility.'" *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)). Four factors are considered when evaluating the severity of alleged harassment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276.

Alexander argues that the United States Supreme Court case of *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006), mandates the finding of a hostile work environment due to the usage of the term "boy." In *Ash*, the Supreme Court did address the meaning of this term in the context of a hostile work environment claim, but it only clarified the Eleventh Circuit's erroneous holding that modifiers or qualifications were necessary in all instances to render the term probative of bias. *Id.* The Court reasoned that "it does not follow that the term ["boy"], standing alone, is always benign" because "[t]he speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Id.* The Court acknowledged that "it is true the disputed word will not always be evidence of racial animus," however. *Id.*

*Ash* does not change the result of an analysis of Alexander's claim. Even assuming

8

each use of the term "boy" was motivated by racial animus, upon examination of the four factors, the court finds the frequency and severity of the alleged harassment to be inadequate to support a *prima facie* claim of hostile work environment. The frequency and severity of the alleged conduct here pales in comparison to that which has been held insufficient in other Eleventh Circuit cases. *Compare Barrow v. Ga. Pac. Corp.*, 144 Fed. Appx. 54, 57 (11th Cir. 2005) (finding no hostile work environment even when the employee's superintendent called him "nigger" three times in one year, repeatedly called him "boy," told him two or three times he was going to kick his "black ass;" the employee's supervisor called him a "nigger" and threatened to cut him for looking at a white girl; and another supervisor called him "black boy"), *with Miller*, 277 F.3d at 1276 (finding sufficient evidence of frequency where supervisor "hurled the ethnic slurs at [the plaintiff] three to four times a day"), *and Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (holding that "roughly fifteen separate instances of harassment over the course of four months" was sufficient to demonstrate a sexually harassing environment).

While calling Alexander a "boy" is disrespectful and insulting to a grown black man, and carries historic racial overtones when coming from a white man, the eight to eleven instances occurred sporadically over the course of two years, and they were never used in conjunction with any verbal modifiers that would otherwise enhance its derogatory nature. Furthermore, Alexander presents no evidence that he was hindered in his ability to do his job as a result of the statements. Additionally, for the most part, the alleged harassment did not

contain any physical threat. Only the noose comment could be construed as a kind of veiled threat, and it only occurred once and was not directed at him. The alleged discussion Alexander overheard about someone who witnessed a past incident involving a noose is far less directly threatening than the actions taken by other supervisors which were determined to not constitute a hostile work environment. *See Washington v. Kroger Co.*, 218 Fed. Appx. 822, 825 (11th Cir. 2007) (finding no hostile environment when co-worker allegedly hung a plastic figurine representing the employee with a rope and called him names such as "boy"); *Barrow*, 144 Fed. Appx. at 57 (finding no hostile work environment where noose was hung in co-worker's locker). Therefore, the alleged noose comment and the incidents when Alexander was called "boy," which were made over the course of two years, are not sufficient to establish a *prima facie* claim of hostile work environment under the totality of the circumstances.

Finally, Alexander also alleges that black custodians had to do more work than white ones, and that his time card was altered to reduce his reported hours worked. Giving an employee a difficult or different work assignment does not meet the standard for establishing a hostile work environment in the Eleventh Circuit, and therefore, this allegation does not support a claim for hostile work environment.[5] *See, e.g.*, *Davis v. U.S. Postmaster Gen.*, 190 Fed. Appx. 874, 875-77 (11th Cir. 2006) (holding that an employee's allegations, which

---

[5] Additionally, the School Board proffers evidence that any changes in Alexander's work assignments were based on legitimate business reasons, such as logistics, and that the overall work burden was balanced equally between custodial staff. (Wingo Aff. ¶¶ 4-7.) Alexander cites no evidence and makes no legitimate argument that the School Board's explanation is a pretext.

included changing his job responsibilities and giving him difficult work assignments, did not meet the standard for establishing a hostile work environment even if true).

As to the disputed time cards, Alexander's response brief does not argue it constitutes part of the harassment to which he was allegedly subjected, and therefore the court deems this argument as waived for the purposes of establishing a claim of hostile work environment. *See Stack v. Dep't of Army*, 160 Fed. Appx. 857, 857 n.1 (11th Cir. 2005) (finding the plaintiff abandoned her hostile work environment claim "when she failed to rely upon [it] in summary judgment"); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") Furthermore, the alleged circumstances of a supervisor taking off hours that the employee had worked, and yet the employee willingly signed the time cards anyway, strikes the court as extremely dubious. While evidence at the summary judgment stage must be viewed in the non-movant's favor, it is "only to the extent that it would be reasonable for a jury to resolve the factual issues that way." *Evans v. Stephens*, 407 F.3d 1272, 1284 (11th Cir. 2005) (Carnes, J., concurring specially); *see also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) ("The nonmovant need not be given the benefit of every inference but only of every reasonable inference."). Because the argument is deemed abandoned, and because the court finds it would be objectively unreasonable for a jury to rely on the scant evidence of altered time cards, this allegation also does not support a claim for hostile work environment. Alexander has not established a

11

*prima facie* claim for hostile work environment, and the School Board's motion for summary judgment is due to be granted.

## V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the defendant's Motion for Summary Judgment (Doc. # 36) is GRANTED as to each and every claim brought by the plaintiff.

An appropriate judgment will be entered.

DONE this 12th day of February, 2008.

_____/s/  W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE